JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re: | Jointly Administered Chapter 11 Cases |
| **AVIZA TECHNOLOGY, INC.,**<br>A Delaware corporation<br>Employer's Tax ID No.: 20-1979646 | Case No. 09-54511-RLE-11 |
| **AVIZA, INC.,**<br>A Delaware corporation<br>Employer's Tax ID No.: 20-0249205 | Case No. 09-54514-RLE-11 |
| **TRIKON TECHNOLOGIES, INC.,**<br>A Delaware corporation<br>Employer's Tax ID No.: 95-4054321 | Case No. 09-54515-RLE-11 |
| Debtor(s).<br><br>440 Kings Village Road<br>Scotts Valley, CA 95066 | Date: August 27, 2009<br>Time: 9:30 a.m.<br>Place: United States Bankruptcy Court<br>280 S. First St., Room 3099<br>San Jose, CA 95113<br>Judge: Honorable Roger L. Efremsky |

### MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS

# TABLE OF CONTENTS

Page

**I.**  Summary Of Sale And Relief Sought ......................................................................1

**II.**  Background Summary ........................................................................................3

**III.**  The Motion.......................................................................................................6

    A.  Bidding Procedures.................................................................................6
    B.  Expense Reimbursement........................................................................6
    C.  Scheduling of Sale Hearing. ..................................................................7
    D.  Provisions for Notice and Objection Dates.............................................8
    E.  Proposed Form of Bid Procedures Order.................................................12

**IV.**  Argument .........................................................................................................12

    A.  This Court Should Approve the Proposed Bid Procedures Because the
         Procedures Are Fair, Reasonable And In The Best Interests of Debtors' Estates. ......12

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.),*
    950 F.2d 1492 (9th Cir. 1991) ............................................................................12

*In re 995 Fifth Avenue Associates, L.P.,*
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ....................................................................13

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re
    Integrated Resources, Inc.),*
    147 B.R. 650 (S.D.N.Y. 1992), app. dism. on jurisdictional grounds 3 F.3d 49
    (2d Cir. 1993) ....................................................................................................13

*In re Integrated Resources, Inc.,* 147 B.R. at 657-58 ...........................................13

*In re Hupp Industrial, Inc.,*
    140 B.R. 191 (Bankr. N.D. Ohio 1992) ...............................................................13

*In re America West Airlines, Inc.,*
    166 B.R. 908 (Bankr. D. Ariz. 1994) ..................................................................14

*AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing, Inc.),*
    321 B.R. 496 (8th Cir. B.A.P. 2005) ..................................................................14

*In re APP Plus, Inc.,*
    223 B.R. 870 (Bankr. E.D.N.Y. 1998) ................................................................14

*In re Bethlehem Steel Corp.,*
    2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. July 28, 2003) ....................................14

*Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental
    Energy, Inc.),*
    181 F.3d 527 (3d Cir. 1999).................................................................14, 15, 16

*In re O'Brien Envtl. Energy, Inc.,* 181 F.3d at 535...............................................14

*In re O'Brien Envtl. Energy, Inc.,* 181 F.3d at 537, 181 F.3d at 537 ....................15

## DOCKETED CASES

*In re Calico Commerce, Inc.,*
    Case No. 01-56101.............................................................................................15

*In re Chevys Inc.,*
    Case No. 03-45879.............................................................................................15

*In re Clarent Corp.,*
    Case No. 02-33504.............................................................................................15

*In re Sanrise, Inc.,*
    Case No. 02-43167.............................................................................................15

*In re Merchant Land Fund I*,
    Case No. 02-43663........................................................................................15

*In re Site Technologies, Inc.*,
    Case No. 99-50736........................................................................................15

## FEDERAL STATUTES

11 U.S.C. § 363..................................................................................................1

11 U.S.C. § 363(b)............................................................................................12

11 U.S.C. § 365(b)(1)(A) and (B).....................................................................11

11 U.S.C. § 507(a)(2)..........................................................................................7

11 U.S.C. § 1107..................................................................................................3

11 U.S.C. § 1108..................................................................................................3

B.L.R. 2002-1(c)..................................................................................................8

Fed. R. Bankr. P. 2002........................................................................................9

Fed. R. Bankr. P. 9010(b)...................................................................................9

Fed. R. Bankr. P. 9014......................................................................................10

Fed. R. Bankr. P. 6004......................................................................................12

Fed. R. Bankr. P. 6004(f)(1).............................................................................12

## MISCELLANEOUS

3 Collier on Bankruptcy ¶ 363.03[7] (15th ed. 2002).....................................14

3 Collier on Bankruptcy ¶ 363.02[7] (15th ed. rev. 2009)..............................14

Kelly K. Frazier, A COMPARISON SHOPPING GUIDE FOR 363 SALES (2009) .....................15

DAK
K:\Aviza\Pld\Sale\MotSaleProc(SPP)\Mot v8.doc

iii

MOTION FOR ORDER APPROVING OVERBID
PROCEDURES AND RELATED MATTERS RE
SALE OF CERTAIN ASSETS OF THE DEBTORS

# TABLE OF EXHIBITS

**EXHIBIT "A":**    *Proposed* BID PROCEDURES with APPENDIX thereto

**EXHIBIT "B":**    *Proposed* form of NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, ESTABLISHMENT OF SALE OVERBID PROCEDURES AND OPPORTUNITY FOR OVERBID AT AUCTION

**EXHIBIT "C":**    *Proposed* form of NOTICE OF HEARING ON MOTION TO AUTHORIZE DEBTORS TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND unexpired LEASES IN CONNECTION WITH THE SALE OF CERTAIN ASSETS OF THE DEBTORS, with Exhibit "A" thereto

**EXHIBIT "D":**    *Proposed* form of ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS

Aviza Technology, Inc. ("ATI"), Aviza, Inc. ("Aviza") and Trikon Technologies Inc. ("Trikon" and collectively with ATI and Aviza, the "Debtors" or the "Company"), the debtors and debtors in possession in these jointly administered cases hereby move this Court for entry of an order approving certain sale procedures in connection with the proposed sale of certain of the Debtors' assets to Sumitomo Precision Products Co., Ltd., or its designated affiliate ("SPP").

This motion (the "Motion" or "Bid Procedures Motion") is made pursuant to 11 U.S.C. § 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004. This Motion is supported by the DECLARATION OF PATRICK C. O'CONNOR IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS (the "O'Connor Declaration"), the DECLARATION OF DORIS A. KAELIN IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS (the "Kaelin Declaration"), and the DECLARATION OF WILLIAM JOHNSON IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS (the "Johnson Declaration") and will be based on such other evidence and argument as may be presented at the hearing on the Motion.

## I.    SUMMARY OF SALE AND RELIEF SOUGHT

1.      Following several months of marketing by its investment banker, the Company signed a Letter of Intent with SPP for the sale of certain of the assets and businesses of the Company and its subsidiaries. On August 13, 2009, the Debtors executed a definitive ASSET PURCHASE AGREEMENT (the "Purchase Agreement") with SPP, subject to approval of this Court. A copy of the Purchase Agreement is attached to the O'Connor Declaration as Exhibit "A."

2.      The Purchase Agreement provides for the sale (the "Sale") of certain assets of the Debtors including those assets related to its system, service, parts, spares and upgrade businesses for batch thermal products and technologies, atmospheric-pressure chemical vapor deposition products and technologies, physical vapor deposition products and technologies, chemical vapor deposition products and technologies, and plasma etch products and technologies, as well as its service, parts, spares and upgrade business for atomic layer deposition products and technologies (all as described more fully in the Purchase Agreement, the "Purchased Assets"). The Purchase Agreement excludes,

among other things, cash, the Debtors' real property located in Scotts Valley and the manufacturing

facilities located thereon, the Debtors' offices in Orange County, its rights under certain contracts

and leases, certain avoidance claims and causes of action, and other assets as specified in the

Purchase Agreement.  The Purchase Agreement further provides for the assumption and assignment

of certain specified executory contracts and unexpired leases of the Debtors.  The sale of the

Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests except

as provided by the Purchase Agreement.

3.      The Purchase Agreement provides for a Purchase Price (as that term is defined in the

Purchase Agreement) comprised of the following three (3) components:  (1) Fifteen Million Dollars

($15,000,000) of cash, subject to certain limited adjustments; (2) a secured recourse promissory note

with an aggregate principal amount of Ten Million Dollars ($10,000,000); and (3) a secured non-

recourse promissory note that is expected to have an initial aggregate principal amount of

approximately Thirty-One Million Five Hundred Thousand Dollars ($31,500,000), based upon the

inventory and accounts receivable value as determined and agreed upon by the parties in accordance

with the Purchase Agreement.  Details regarding the calculation, valuation and ultimate

determination of each such amount are set forth in the Purchase Agreement.  In addition, SPP has

agreed to assume certain liabilities of the Debtors and their subsidiaries, including the assumption of

the lease for a facility in South Wales and approximately Five Million Dollars ($5,000,000) of

operating liabilities.  The Debtors currently estimate that the gross proceeds from the Sale will

aggregate approximately $50 million.

4.      Pursuant to the order entered on the Debtors' cash collateral motion following a final

hearing on July 30, 2009, the Lender (as defined at Paragraph 15 below) has the option to terminate

the Debtors' use of cash collateral upon certain events, including if the Sale does not close on or

before September 30, 2009.  Time is therefore of the essence to close the Sale.

5.      By this Motion, the Debtors seek approval of certain bid procedures including the

terms and conditions of any competing bids and the reimbursement of actual out-of-pocket costs and

expenses incurred by SPP up to a cap of $1 million, in the event that the Purchase Agreement is

terminated as discussed below.

6. Pursuant to this Motion, the Debtors also request that the Court specially set, on shortened time, the hearing (the "Sale Hearing") on the motion to approve the sale of the Purchased Assets free and clear of liens, claims, encumbrances and other interests (the "Sale Motion"). The Debtors request that the Sale Hearing be scheduled for September 25, 2009 at 10:00 a.m.[1] In connection with the Sale, the Debtors also request that the Court specially set for the same date and time the hearing on the Debtors' motion to approve the assumption and assignment of executory contracts and leases (to which any of ATI, Aviza or TTI is a party) to be included in the transaction (the "Assumption Motion"). As set forth below, the Debtors request that the Court (i) authorize notice of the hearing on the Sale Motion and the Assumption Motion, and any objections thereto, be shortened as requested herein, and (ii) deem service as proposed herein to be sufficient under the circumstances.

7. Finally, the Motion requests that the Court approve the form of notice to be provided with respect to the Sale Motion and the Assumption Motion.

## II. BACKGROUND SUMMARY

8. On June 9, 2009 (the "Petition Date"), ATI, Aviza and Trikon each filed their individual voluntary petitions under Chapter 11 of the Bankruptcy Code (the "Code"). ATI, Aviza and Trikon are presently operating their businesses as debtors in possession under 11 U.S.C. §§ 1107 and 1108.

9. On June 10, 2009, this Court entered its ORDER AUTHORIZING AND DIRECTING JOINT ADMINISTRATION OF ESTATES in the Debtors' cases.

10. An Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States Trustee on June 23, 2009 and is currently represented by counsel.

11. ATI is a publicly traded company whose stock is traded on the Nasdaq Global Market under the symbol "AVZA." As of February 3, 2009, ATI had 21,856,473 shares of its common stock outstanding, held by approximately 2,865 stockholders. ATI is a holding company whose sole assets consist of shares of stock in Aviza and Trikon, its wholly owned subsidiaries. There are a

---

[1] Counsel for the Debtors has reserved this date and time with the Court's calendar clerk pending approval by the Court.

total of 22 corporate entities in the Aviza family.

12.    The Company designs, manufactures, sells and supports advanced semiconductor capital equipment and process technologies for the global semiconductor industry and related markets.  The Company's customer base is geographically diverse and includes both integrated device manufacturers and foundry based manufacturers.  The Company has a broad installed base with approximately 2,500 systems installed worldwide.  The Company is headquartered in Scotts Valley, California and operates its manufacturing, sales and support through directly and indirectly wholly owned subsidiaries in the United States, the United Kingdom, France, Germany, Korea, Japan, Malaysia, Singapore, Taiwan, Peoples Republic of China and Israel.

13.    The Company's consolidated balance sheet for the fiscal quarter ending December 26, 2008 lists assets of $89,365,000, liabilities of $69,022,000 and stockholder's equity of $20,343,000.  The Company lost $47,364,000 on sales of $133,189,000 in the fiscal year ending September 26, 2008.

14.    The Company operates in the semiconductor industry which has been experiencing, and is expected to continue to experience, severe instability.  The National Bureau of Economic Research officially declared that the United States entered into a recession in December of 2007 and has remained there since.  The Company's forecasts for the second quarter of fiscal 2009 are predicated on continued weakness in customer demand.  The Company expects that net sales for the second quarter of fiscal 2009, which ended on March 27, 2009, will be in the range of $9.5 million to $11 million, with an adjusted net loss in the range of $5.0 million to $6.0 million, excluding restructuring charges which are expected to be in the range of $9.0 million to $10.0 million.

15.    On April 13, 2007, ATI and Aviza entered into a LOAN AND SECURITY AGREEMENT and related documents (collectively, the "Loan Agreement") with United Commercial Bank, East West Bank and ChinaTrust Bank (USA) (collectively, the "Lender") for a credit facility (the "Pre-Petition Secured Credit Facility") pursuant to which the Lender provided credit to approximately $55,000,000 under a revolving line of credit, an equipment term loan and a real estate term loan.  As of the Petition Date, ATI and Aviza owed the Lender approximately $28,300,000 (excluding accrued interest).  This obligation (the "Pre-Petition Secured Obligations") is secured by the assets of ATI

and Aviza, but not the assets of Trikon or any other directly or indirectly owned subsidiary. On May 20, 2009, the Lender sent a letter to the Company declaring certain provisions of the Loan Agreement to be in default, accelerating the balance due, demanding payment in full of the Pre-Petition Secured Obligations and advising of their intent to exercise their rights and remedies.

16.     Due to the rapid decline in new orders and sales being experienced industry-wide, on November 20, 2008, the Company engaged the investment banking firm of Needham & Company, LLC ("Needham") to assist it in exploring opportunities to sell the Company and/or raise additional equity investment. Needham contacted over 30 companies and conducted over 10 management meetings and/or presentations. As the months progressed, it became clear that the only salvation for the company was a sale of its assets, including the stock or assets of some of its directly or indirectly owned subsidiaries. Needham's efforts culminated in the execution of the Purchase Agreement. The Debtors believe the SPP transaction will result in payment in full of the Pre-Petition Secured Obligations and possibly leave other sale proceeds to pay to the Company's unsecured creditors.

17.     Over the past several months, Needham and the Company have been in contact with several companies who might have an interest in acquiring the Purchased Assets which efforts will continue in the coming weeks. Establishment of the bid procedures will formalize this process and assist in the Debtors' efforts to encourage diligence by possible acquirers.

18.     As indicated above, the Debtors' use of cash collateral with the Lender's consent may terminate at the Lender's option if the Sale does not close by September 30, 2009. In order to yield the greatest possible return for the benefit of creditors and to cut off potential administrative expenses, the Debtors believe that an expedited auction and sale process is warranted and necessary.

19.     The Debtors have a data room established for prospective bidders. The Debtors believe that they have identified those persons who could be interested in presenting a bid, all of whom will be provided notice of the hearing on this Motion. The Debtors believe that an expedited sale process is necessary to realize the highest value for the Purchased Assets and that the Sale is in the best long-term interest of the Debtors' customers, partners, vendors and employees. Accordingly, the Debtors request a special setting of the Sale Hearing in order that the Debtors can provide notice of the hearing on the Sale Motion and the Assumption Motion as proposed herein.

20.     In addition to creating a source of recovery for other creditors by conducting a sale of the Company's assets as a going concern and subject to overbid, the proposed sale provides additional benefit to creditors in that it is contemplated that a number of the Debtors' contracts pertaining to the assets to be acquired will be assumed and assigned to SPP in conjunction with the Sale, which is anticipated to reduce the overall claims against the Debtors.  The proposed sale to SPP is anticipated to provide the best opportunity for a return to creditors by realizing a sale of a substantial portion of the Debtors' assets as a going concern.  The Debtors have proceeded with the proposed sale to SPP with the support of the Lender.  The Debtors anticipate that the Lender will consent to the Sale free and clear of its liens, with such liens to attach to the proceeds of the Sale to the same extent and priority as exists as of the Closing.  The Debtors also anticipate the Committee will support the Sale.

## III.     THE MOTION

**A.      Bidding Procedures.**

21.     As an inducement to SPP to agree to enter into the Purchase Agreement subject to third party diligence and bidding, and in order that the sale process will not be delayed by last minute offers, the Debtors believe that the Court should establish a competing bid procedure concerning bids by any other prospective buyers.  The Debtors submit that the proposed competing bid procedure described in **Exhibit "A"** attached hereto and incorporated herein by reference (the "Bid Procedures") is reasonable and necessary under the circumstances and will facilitate the consummation of an orderly sale and maximize the value of the Purchased Assets for the Debtors' Chapter 11 estates.

**B.      Expense Reimbursement.**

22.     The Purchase Agreement entitles SPP to be reimbursed for all actual, reasonable out-of-pocket costs and expenses (including fees to professionals) incurred by SPP in connection with the Purchase Agreement and the Contemplated Transactions (as defined by the Purchase Agreement), up to a cap of $1,000,000 (the "Expense Reimbursement").  Section 9.3(b) of the Purchase Agreement sets forth the following circumstances in which payment is required:

9.3(b)  The Seller Parties shall pay to Buyer, by wire transfer of

immediately available funds to an account designated by Buyer, reimbursement for all of Buyer's reasonable out-of-pocket costs and expenses, including fees to professionals, incurred in connection with this Agreement and the Contemplated Transactions, in an amount not to exceed One Million Dollars ($1,000,000) (the "Expense Reimbursement"), as follows: (A) following any termination by any Party pursuant to Section 9.2(i), the Expense Reimbursement shall be paid concurrently with the closing of such Alternative Transaction, (B) following any termination by Buyer pursuant to Section 9.2(c), Section 9.2(d), Section 9.2(g) or Section 9.2(h), by the Seller Parties pursuant to Section 9.2(g), or by any Party pursuant to Section 9.2(j), and in each case provided that Buyer is not then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement, then the Expense Reimbursement shall be paid concurrently with the closing of any Alternative Transaction following such termination, and (C) following any termination by Buyer pursuant to Section 9.2(e) or Section 9.2(f), then the Expense Reimbursement shall be paid within one (1) Business Day following such termination. Each Seller Party shall be jointly and severally liable for the payment of the Expense Reimbursement to Buyer.

23.     In the event SPP is entitled to the Expense Reimbursement, the Purchase Agreement provides that such obligation will have priority as an administrative expense under section 507(a)(2) of the Bankruptcy Code and will be paid as a carve-out to and from, and free and clear of the liens, claims and encumbrances of, the Lender and any other secured creditors on, the proceeds of such sale.

24.     The circumstances under which damages are payable to SPP and the factual basis upon which the Debtors determined the provision was reasonable are set forth in the Kaelin Declaration. The Johnson Declaration provides additional information pertaining to SPP's transaction costs.

**C.      Scheduling of Sale Hearing.**

25.     In furtherance of the Sale, the Debtors request that the Sale Hearing (to include both the Sale Motion and the Assumption Motion) be scheduled by the Court for September 25, 2009 at 10:00 a.m. As discussed above, the Company's financial situation also requires that the Sale close as soon as possible. Based on the extensive marketing of the opportunity over the past months, the Debtors also do not believe that additional time will yield any additional bids. Counsels for the Committee, the Lender and SPP have all confirmed availability on September 25, 2009 and none

have opposed the request for shortened time under the circumstances. Based on the executory

contracts and unexpired leases scheduled by the Debtors, there are also potentially approximately 85

parties to executory contracts and unexpired leases who are impacted by the request for a hearing on

shortened time.[2] If any particular issues arise regarding adequate protection or disputes over cure

amounts (which are not anticipated), the Debtors are confident that such issues can be addressed in a

timely fashion in order that the Sale may close as contemplated.

26.     In connection with the Sale, the Debtors request that the Court establish the dates and

manner of service for various notices. The Debtors also request that the Court establish certain

objection deadlines including the date by which persons must object to the Debtors' proposed "cure"

amounts in connection with the proposed assumption and assignment of executory contracts and

unexpired leases.

**D.      Provisions for Notice and Objection Dates.**

27.     **Notices**. Debtors request authority to utilize the service lists maintained by their

bankruptcy counsel for all mailings pertaining to the Sale in that counsel will have a more updated

list than the Creditor Matrix filed with the Court on the Petition Date. For example, the Debtors are

obtaining a more current list of equity holders than the list filed on the Petition Date and included in

the Creditor Matrix. As set forth in the Kaelin Declaration, Murray & Murray also regularly updates

its mailing lists based on return mailings, requests for special notice, proofs of claim filed in the

case, among other updates. B.L.R. 2002-1(c) requires use of a "current mailing list." Debtors

submit that use of Murray & Murray's most current service lists for all sale related notices satisfies

this requirement. The Debtors also request authority to utilize such outside contractors as they may

deem appropriate to handle the duplication of sale-related notices and other pleadings, and to handle

the actual mailing to the persons as established by the Court's order on this Motion, utilizing the

service lists maintained by Debtors' counsel. Payment to such third party contractor(s) will be

---

[2] The Purchase Agreement includes certain contracts, licenses and other agreements of the non-debtor subsidiaries, in addition to certain executory contracts and leases with the debtor sellers. The Assumption Motion addresses only the non-debtor parties to executory contracts and leases with the debtor sellers. The Debtors intend to provide notice to <u>all</u> non-debtor parties to executory contracts and unexpired leases to which any of ATI, Aviza or TTI are a party, of the possibility that their executory contract or unexpired lease may be assumed and assigned, in that other bidders may require different executory contracts and unexpired leases than SPP.

subject to the cash collateral budget with the Lender.  The Debtors propose to provide notice of hearing on sale related matters as provided below.

a.        **<u>Bid Procedures and Sale Motion</u>**.

(i)        Not later than three (3) days after the entry of the Court's order on this Motion (the "<u>Bid Procedures Order</u>"), the Debtors propose to serve notice of the Sale Hearing in substantially the form of **Exhibit "B"** hereto (the "<u>Sale Notice</u>") and a copy of the Bid Procedures Order and the approved Bid Procedures to be sent by first-class mail, postage-prepaid, to (i) the Committee and its counsel; (ii) all entities that claim any interest in or lien on any of the Debtors' assets; (iii) all parties to executory contracts and unexpired leases which the Debtors may seek to assume and assign to the Successful Bidder (as defined in the Bid Procedures) for any of the Debtors' Purchased Assets; (iv) all governmental taxing authorities that have, or as a result of the sale of any of the Debtors' assets may have, claims, contingent or otherwise, against the Debtors; (v) all parties that filed requests for notices or have appeared under Bankruptcy Rules 2002 and/or 9010(b); (vi) all interested governmental, pension, and environmental entities; (vii) the Office of the United States Trustee; (viii) the Lender and its counsel; (ix) to the extent practicable, all entities which within the 12 months prior to the Petition Date have expressed to any of the Debtors an interest in purchasing any of the Purchased Assets; and (x) any other persons designated by the Lender or the Committee who have expressed interest to the Lender or the Committee in acquiring the Purchased Assets (the "<u>Sale Mailing List</u>").

(ii)        Not later than five (5) days after the entry of the Bid Procedures Order, the Debtors shall cause the Sale Notice to be (a) sent by first-class mail, postage-prepaid, to all entities scheduled by the Debtors as holding claims or which have filed proofs of claim, and (ii) all equity holders utilizing the most current lists available[3] (the "<u>Equity Holders</u>").

b.        **<u>Assumption Motion</u>**.  In connection with the Sale Motion, the Debtors will file the Assumption Motion which seeks authority to assume and assign to the Successful Bidder at the Sale Hearing, the Assumed Contracts pursuant to the Purchase Agreement.  The Debtors seek authority to file with the Court and serve on the Sale Mailing List a notice in substantially the form

---

[3] In late July 2009, the Debtors ordered updated stockholder lists for use in mailing the Sale Notice.

of **Exhibit "C"** hereto (the "<u>Assumption Notice</u>") of the Debtors' intention to assume and assign the Assumed Contracts of the non-debtor parties. The Assumption Notice with an attached schedule setting forth the cure amounts as determined by the Debtors (the "<u>Cure Amounts</u>") shall be served by first class mail within three (3) days after entry of the Bid Procedures Order. If no cure amount is listed, the Debtors believe there are no Cure Amount owing to the party to such executory contract or unexpired lease.

28. **<u>Moving Papers (Bid Procedures, Sale Motion and Assumption Motion)</u>**. Following approval of this Motion, the Debtors shall cause, not less than twenty (20) days before the Sale Hearing, service of the pleadings in support of the Sale Motion (which shall include as exhibits, the Purchase Agreement (as filed with the Company's 8-K) and the Bid Procedures approved by the Court), the Assumption Motion, and all declarations in support thereof, by first class mail upon (a) the Office of the United States Trustee for the Northern District of California, San Jose Division; (b) counsel for SPP; (c) the Committee and its counsel; (d) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other property interest in or upon the Debtors or the Purchased Assets; (e) all parties that have expressed a bona fide interest in acquiring the Purchased Assets or that the Debtors believe may be interested in proposing a competing bid upon assets of the Company; (f) the Internal Revenue Service; (g) all entities who have filed a notice of appearance and request for service of papers in these cases; and (h) all non-debtor parties to the Assumed Contracts.

29. **<u>Objection Bar Dates</u>**.

a. **<u>To Asset Sale</u>**. The Debtors request, pursuant to Fed. R. Bankr. P. 9014, that objections, if any, to the Sale, must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, San Jose Division, 280 South First Street, Room 3035, San Jose, California 95113, on or before **September 18, 2009**, and (d) be served no later than **September 18, 2009** upon (1) Debtors' counsel, John Walshe Murray of Murray & Murray, A Professional Corporation, 19400 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014, facsimile (650) 852-9244, email: jwmurray@murraylaw.com; (2) counsel for the Committee, Robert

G. Harris of Binder & Malter LLP, 2775 Park Avenue, Santa Clara, CA 95050, facsimile (408) 295-1531; email: rob@bindermalter.com; (3) counsel for the Lender, Frederick D. Holden, Orrick Herrington & Sutcliffe LLP, 405 Howard Street, San Francisco, CA 94105, facsimile (415) 773-5759, email: fholden@orrick.com; (4) counsel for SPP, William Bates of Bingham McCutchen LLP, 1900 University Avenue, East Palo Alto, CA 94303, facsimile (650) 849-4800, email: bill.bates@bingham.com; and (5) the Office of the United States Trustee, Attn: Nanette Dumas, 280 South First Street, Room 268, San Jose, CA 95113, facsimile (408) 535-5532; email: nanette.dumas@usdoj.gov (the foregoing are collectively referred to as the "Service Parties").

        b.    **To Assumption and Cure Amounts**.  The Debtors further request that the non-debtor parties to the Assumed Contracts have until **September 18, 2009** (the "Cure Bar Date") (a) to object to the assumption and assignment of any of the Assumed Contracts, or (b) object to the amount of the Cure Amounts, or (c) to assert that non-monetary defaults, conditions or pecuniary losses or other amounts must be cured or satisfied (including all compensation for any pecuniary loss resulting from a default in respect of the Assumed Contracts) under any of the Assumed Contracts in order for such Assumed Contracts to be assumed and assigned.  Such party must file and serve an objection upon the Service Parties (the "Assumption and/or Cure Objection") setting forth (i) the basis for the objection (non-monetary or otherwise), and, if applicable, (ii) the amount the party asserts as the cure amount and/or the amount of all compensation for any actual pecuniary loss resulting from a default in respect of the Assumed Contracts (with appropriate documentation in support thereof).  If no objection is received by the Cure Bar Date, the Cure Amounts attached to the Assumption Notice shall be controlling as to the amount necessary to be paid to cure under § 365(b)(1)(A) and (B) notwithstanding anything to the contrary in any Assumed Contract or other document, and the non-debtor party to the Assumed Contract shall be forever barred from asserting any claims for the Cure Amount, including any other defaults, but not limited to pecuniary losses, that otherwise might or should have been asserted by the non-debtor party to the Assumed Contracts, against the Debtors, SPP or such other purchaser of the Purchased Assets, through the effective date of the assumption and assignment in respect of such Assumed Contract, and each party to any Assumed Contracts shall be deemed to have consented to the assumption and assignment of the

Assumed Contract to SPP or any other purchaser of the Purchased Assets, subject to Paragraph 29-c below.

c. Notwithstanding anything herein to the contrary, (a) if any non-debtor party to an Assumed Contract is not satisfied with the showing of adequate assurance of future performance by any competing bidder (other than SPP) by the Sale Hearing, than the non-debtor party shall have the right to raise that objection to the Assumption Motion prior to the Auction at the time of the Sale Hearing; and (b) the Creditors' Committee or the Lender may object at the Sale Hearing to the Debtors' selection of the Successful Bid.

**E. Proposed Form of Bid Procedures Order**.

30. A proposed form of Bid Procedures Order as approved by SPP is attached as an exhibit to the Purchase Agreement and is attached hereto as **Exhibit "D"** attached hereto and incorporated herein by reference. The Debtors will request entry of a Bid Procedures Order substantially in the form of Exhibit "D".

## IV. ARGUMENT

**A. This Court Should Approve the Proposed Bid Procedures Because the Procedures Are Fair, Reasonable And In The Best Interests of Debtors' Estates.**

31. Bankruptcy Code § 363(b) and Rule 6004 of the Federal Rules of Bankruptcy Procedure authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing. <u>See, e.g., Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)</u>, 950 F.2d 1492, 1495 (9th Cir. 1991). In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction. <u>See</u> Fed. R. Bankr. P. 6004(f)(1). Here, the Debtors believe that their ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

32. Among the bid procedures commonly approved by bankruptcy courts is the requirement that a competing bid exceed the stalking horse purchaser transaction by a specified minimum amount. The Bid Procedures will help the Debtors obtain the highest and best possible price for the Purchased Assets. The initial bid by a Qualified Bidder (defined in the Bid Procedures)

1  must include the Purchase Price, plus $1,000,000 representing the maximum Expense

2  Reimbursement amount, plus the Overbid Increment of $500,000 cash (the foregoing is the

3  Minimum Initial Bid under the Bid Procedures).  The Minimum Initial Bid requirement protects the

4  estates from the $1,000,000 Expense Reimbursement of SPP (discussed below) and costs associated

5  with the transaction.  The Bid Procedures also require $500,000 cash increments at the Auction (the

6  Overbid Increment under the Bid Procedures).  While the Overbid Increment represents 1% of SPP's

7  offer (with an estimated gross value of $50,000,000), which is less than the minimum overbid of five

8  percent (5%) set forth under the GUIDELINES FOR EARLY DISPOSITION OF ASSETS IN CHAPTER 11

9  CASES promulgated by the Bankruptcy Court, Northern District of California, the Debtors believe

10  the Overbid Increment is appropriate for these cases and will encourage meaningful overbids.  The

11  Debtors have also reserved the right in the Bid Procedures to modify the increment requirement at

12  the Auction, in consultation with the Creditors' Committee and the Lender.

13       33.     Sellers of assets often employ bidding protections in order to encourage the making

14  of bids.  Break-up fees and other arrangements, such as those proposed here, are "important tools to

15  encourage bidding and to maximize the value of the debtor's assets."  Official Committee of

16  Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R.

17  650, 659 (S.D.N.Y. 1992), app. dism. on jurisdictional grounds 3 F.3d 49 (2d Cir. 1993).

18       34.     Historically, bankruptcy courts have approved bidding incentives similar to the

19  Expense Reimbursement under the "business judgment rule," which proscribes judicial second-

20  guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of

21  honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y.

22  1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the

23  bidding by providing some form of compensation for the risks it is undertaking") (citation omitted);

24  see also In re Integrated Resources, Inc., 147 B.R. at 657-58 (establishing three basic factors for

25  determining whether to permit break-up fees in bankruptcy: whether "the relationship of the parties

26  who negotiated the break-up fee [is] tainted by self-dealing or manipulation," whether the "fee

27  hamper[s], rather than encourage[s], bidding," and whether "the amount of the fee [is] unreasonable

28  relative to the proposed purchase price"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D.

Ohio 1992) (identifying certain factors to be considered in determining the propriety of bid protections); but see In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether the transaction will "[f]urther the diverse interests of the debtor, creditors and equity holders, alike").

35.     "It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909, at *30 (S.D.N.Y. July 28, 2003) (quoting 3 Collier on Bankruptcy ¶ 363.03[7] (15th ed. 2002)); see also 3 Collier on Bankruptcy ¶ 363.02[7] (15th ed. rev. 2009).  Courts which limit or deny such break-up fees do so not because they lack statutory authority, but because they find the fee or amount is not in the best interests of the various parties and/or the estate.  In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909, at *30; see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (denying § 503 claim for break up fee); In re APP Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y. 1998) (denying topping fee).

36.     One form of bid protection afforded a stalking horse purchaser is the reimbursement of its actual expenses.  Some courts allow expense reimbursement using the same analysis as is applied for breakup fees[4] while at least one court outside this Circuit has held that expense reimbursements are not limited like breakup fees to a percentage of the bid.[5]  In a recent publication on 363 sales nationally, the author reviewed 60 sale transactions and identified 30 that addressed expense reimbursements with the following finding: expense reimbursements as a percentage of the stalking-horse proposed purchase price ranged from less than 0.1 percent up to approximately 5.6

---

[4]  See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 535 (Section 503(b) applies to both breakup fees and expenses).

[5]  See AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing, Inc.), 321 B.R. 496, 498 (8th Cir. B.A.P. 2005) (stating that usual cap on break-up fees of one to four percent of the purchase price is inapplicable to expense reimbursements; the only requirement is that the fees and expenses satisfy the requirement of § 503(b)).

percent, with the average being approximately 1.65 percent.[6]  An informal survey of 363 sales in the Northern District of California reveals allowance of the stalking horse purchaser's expenses, whether standing alone or in conjunction with a breakup fee, of generally between two and five percent.[7]

37.    The Debtors have formulated a bidding process that is fair and reasonable in view of the transaction size and type and which the Debtors believe will induce prospective competing bidders to present a bid.  The Expense Reimbursement, representing 2% of the anticipated gross proceeds of the Sale of $50 million, is consistent with the range of expense reimbursement typically approved.

38.    The Expense Reimbursement is also fair and reasonable in amount in view of SPP's efforts to date and the risks associated with being a "stalking horse."  The Debtors are informed that SPP has already incurred approximately $2 million in expenses in connection with the Sale (in other words, twice the capped amount).  As set forth in the Johnson Declaration and the Kaelin Declaration, the complexities of the transaction have resulted in higher than typical transaction costs.  These factors include the requirement of multiple transaction documents due to the number of subsidiaries involved in the Sale, implicating a number of issues including issues particular to the laws of multiple foreign jurisdictions, a number of transition and ancillary documents pertaining to the contemplated transactions, among other issues.  The Expense Reimbursement benefits the estate because it assists in maximizing the value to the estates by facilitating a sale of the Debtors' business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of SPP's offer.  See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537 (explaining that a break-up fee

---

[6]  See Kelly K. Frazier, A COMPARISON SHOPPING GUIDE FOR 363 SALES (2009) at p. 146 and Exhibit 5.2.1.  For the Court's convenience, a copy of these referenced pages are attached to the Kaelin Declaration as Exhibit "A."

[7]  See, e.g., In re Chevys Inc., Case No. 03-45879 (purchase price of $77.9 million, with expense reimbursement of $1.5 million (1.9%)); In re Clarent Corp., Case No. 02-33504 (purchase price of $9.8 million, with expense reimbursement of $0.55 million (5.6%)); In re Sanrise, Inc., Case No. 02-43167 (purchase price of $2.5 million, with a break up fee of $100,000 (4%) and expenses of $75,000 (3%)); In re Merchant Land Fund I, Case No. 02-43663 (two stalking horse bidders in $26-$27 million transaction, second breakup fee was twice actual costs, with a cap of $1 million (up to 3.7%)); In re Calico Commerce, Inc., Case No. 01-56101 (break-up fee and expenses fixed at $250,000, representing 5% of the initial purchase price); In re Site Technologies, Inc., Case No. 99-50736 (approved break-up fee was buyer's reasonable costs and expenses not to exceed 5% of the purchase price).  This sampling excludes those cases involving a break-up fee or topping fee exclusively (i.e., without a specified expense reimbursement component).

could be found to be a benefit to the estate where "assurance of a break-up fee promoted more competitive bidding").

39.     The Debtors do not believe that the amount of the Expense Reimbursement is so substantial so as to chill other potential bidders from submitting competing bids. Rather, the capped amount is reasonable compared to the total consideration under the Purchase Agreement and will only be paid if the assets are sold to a bidder other than SPP necessarily providing greater value for the Purchased Assets. Even in the absence of the Expense Reimbursement, an incremental amount would be appropriate to assure that the Debtors are dealing with only serious bidders with the financial ability to complete a transaction without delay.

40.     Further, the Expense Reimbursement has arguably already encouraged competitive bidding, in that SPP would not agree to negotiate and execute the Purchase Agreement without this provision. The Expense Reimbursement thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537. Similarly, SPP's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." Id. Finally, the mere existence of the Expense Reimbursement permits the Debtors to insist that competing bids for the Debtors' assets be sufficiently higher than that being offered by SPP, a clear benefit to the Debtors' estates.

41.     Protection of opening bidders is the price paid for a debtor's enjoyment of the best of both worlds - the assurance of a contractually bound purchaser at a fair price, on the one hand, and at the same time the potential of an even better bid with the corresponding enhanced benefit to the estate. The Debtors' ability to offer the Expense Reimbursement enables it to ensure the sale of the Debtors' assets to a contractually-committed bidder. Under the circumstances, the Debtors believe the Expense Reimbursement (capped at $1 million) is reasonable and should be approved.

42.     The Debtors believe that the foregoing Bid Procedures and the Expense Reimbursement are fair, reasonable, and are appropriately structured to ensure that the Debtors will obtain the best offer for the Purchased Assets. The proposed Bid Procedures allow the Debtors to maximize the value of the Purchased Assets while also ensuring that (a) only legitimate overbids are

received from entities interested in purchasing Debtors' interest in the Purchased Assets; and (b) any overbid is sufficient to cover the Expense Reimbursement required to be paid to SPP if an overbid is accepted and the sale consummated. The Debtors further believe, in their reasoned business judgment, that the proposed sale (subject to the Bid Procedures) is in the best interests of the estates and creditors because it will maximize the value of the Debtors' assets.

**WHEREFORE**, the Debtors respectfully request that the Court enter its order substantially in the form of Exhibit D hereto, including the following:

1. Granting the Motion;

2. Designating SPP or its designee as the Stalking Horse Purchaser;

3. Approving the Bid Procedures as set forth on **Exhibit "A"** hereto;

4. Approving the Expense Reimbursement as set forth herein;

5. Scheduling the hearing on the Sale Motion (including the Auction) and the Assumption Motion for September 25, 2009 at 10:00 a.m.;

6. Authorizing the Debtors to use the service lists maintained by their bankruptcy counsel for all mailings contemplated hereunder (rather than the Court's mailing matrix) in satisfaction of the requirements of Bankruptcy Local Rule 2002-1(c); and provided further, the Debtors may use an outside copy service of their choosing to handle the duplication and mailing of all pleadings to be mailed in connection with the Sale, utilizing the service lists maintained by Debtors' counsel. Payment to any such outside service company utilized by the Debtors shall be in accordance with the Debtors' cash collateral budget with Lender;

7. Approving the manner of notice and service of the other pleadings as proposed at Paragraphs 27 and 28 herein and determining that such notice and manner of service is adequate and reasonable under the circumstances;

8. Shortening time such that the Cure Bar Date and the deadline for objections to the Sale Motion and the Assumption Motion shall be **September 18, 2009**;

9. Approving the forms of Sale Notice and Assumption Notice in substantially the form of **Exhibits "B** and **"C"** hereto, respectively; and

/ / /

1     10.    For such other and further relief as the Court deems appropriate.

2    Dated: August 18, 2009                      **MURRAY & MURRAY**
                                                A Professional Corporation
3

4                                               By:  */s/ Doris A. Kaelin*
                                                     Doris A. Kaelin
5                                                    Attorneys for Debtors