JOHN WALSHE MURRAY (074823)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:  (650) 852-9244
Email:  jwmurray@murraylaw.com
Email:  dkaelin@murraylaw.com
Email:  thwang@murraylaw.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re: | Jointly Administered Chapter 11 Cases |
| **ATI LIQUIDATING, INC.,** formerly known as Aviza Technology, Inc., Employer's Tax ID No.: 20-1979646 | Case No. 09-54511-RLE-11 |
| **AI LIQUIDATING, INC.,** formerly known as Aviza, Inc., Employer's Tax ID No.: 20-0249205 | Case No. 09-54514-RLE-11 |
| **TTI LIQUIDATING, INC.,** formerly known as Trikon Technologies, Inc., Employer's Tax ID No.: 95-4054321 | Case No. 09-54515-RLE-11 |
| | Date:  February 11, 2010 Time:  2:00 p.m. |
| Debtor(s). | Place:  United States Bankruptcy Court 280 S. First St., Room 3099 San Jose, CA  95113 |
| 440 Kings Village Road Scotts Valley, CA  95066 | Judge:  Honorable Roger L. Efremsky |

DISCLOSURE STATEMENT
FOR DEBTORS' JOINT PLAN OF LIQUIDATION
(DATED JANUARY 7, 2010)

**[THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT]**

# **TABLE OF CONTENTS**

Page

ARTICLE I. INTRODUCTION ...................................................................................................1

ARTICLE II. DEFINITIONS ......................................................................................................2

ARTICLE III. SUMMARY OF PLAN TREATMENT ...............................................................2

    3.1    The Chapter 11 Process. .........................................................................................2
    3.2    Bankruptcy Filing. ..................................................................................................2
    3.3    Voting Instructions. ................................................................................................3
    3.4    Confirmation Hearing. ...........................................................................................3
    3.5    Substantive Consolidation. .....................................................................................3
    3.6    Means of Implementation of the Plan. ...................................................................4
    3.7    Specific Treatment. ................................................................................................5

ARTICLE IV. THE BANKRUPTCY FILING ...........................................................................9

ARTICLE V. HISTORY AND PRESENT POSTURE OF THE CASE .......................................9

    5.2    Events Precipitating the Bankruptcy Filing. ........................................................10

        5.3.1    Use of Cash Collateral. .............................................................................11
        5.3.2    The SPP Purchase Transaction. .................................................................12
        5.3.3    The Low-K Patents Transaction. ...............................................................14
        5.3.4    Excess Equipment Sales. ...........................................................................15
        5.3.5    Retention of Professionals. ........................................................................16
        5.3.6    Allowance of Fees of Court-Appointed Professionals.................................16
        5.3.7    Appointment of Responsible Individual. ....................................................17
        5.3.8    Rejection of Leases. ..................................................................................18
        5.3.9    IBM Corporation Relief From Stay. ..........................................................18
        5.3.10   Other Bankruptcy Administration Matters. ...............................................19
        5.4.1    The Debtors' Secured Debts. .....................................................................20
        5.4.2    The Debtors' Unsecured Debts....................................................................24

ARTICLE VI. CLAIMS AND EQUITY INTERESTS AND TREATMENT UNDER THE PLAN.26

        6.1.1    Description.................................................................................................26
        6.1.2    Administrative Claims – Estimate. .............................................................27
        6.1.3    Administrative Claims – Treatment. ..........................................................29
        6.1.4    Administrative Claims – Deadline for Requests for Payment. .....................29
        6.2.1    Description.................................................................................................29
        6.2.2    Tax Claims – Treatment. ...........................................................................30
        6.3.1    Description (Class 1 Under the Plan)..........................................................30
        6.3.2    Secured Claim of the Banks – Treatment. ..................................................30
        6.4.1    Description (Class 2 Under the Plan)..........................................................31
        6.4.2    Secured Claim of ESI – Treatment. ...........................................................31
        6.5.1    Description (Class 3 Under the Plan)..........................................................31
        6.5.2    Secured Claim of Iron Mountain – Treatment. ..........................................32
        6.6.1    Description (Class 4 Under the Plan)..........................................................32
        6.6.2    Other Secured Claims – Treatment. ...........................................................33
        6.7.1    Description (Classes 5 and 6 under the Plan). .............................................33
        6.7.2    Employee Priority Claims – Treatment. .....................................................34

| | | | |
|---|---|---|---|
| 6.8 | Top Hat Claims | ........................................................................... | 35 |
| | 6.8.1 | Description (Class 7 under the Plan). ....................................... | 35 |
| | 6.8.2 | Top Hat Claims – Treatment. ................................................... | 35 |
| | 6.9.1 | Description (Class 8 under the Plan). ....................................... | 35 |
| | 6.9.2 | Timely Filed Unsecured Claims – Treatment. ....................... | 36 |
| | 6.10.1 | Description (Class 9 Under the Plan). ..................................... | 37 |
| | 6.10.2 | Late Filed Unsecured Claims – Treatment. ............................ | 37 |
| | 6.11.1 | Description (Class 10 under the Plan). .................................... | 37 |
| | 6.11.2 | Holders of Interests (Common Stock) - Treatment.................. | 38 |
| 6.12 | Interests (Option Holders)................................................................ | | 39 |
| | 6.12.1 | Description (Class 11 under the Plan). .................................... | 39 |
| | 6.12.2 | Interests (Option Holders) – Treatment. ................................. | 39 |
| ARTICLE VII. IMPLEMENTATION OF THE PLAN OF REORGANIZATION | | ........................... | 39 |
| | 7.3.1 | Cash Collateral ......................................................................... | 40 |
| | 7.3.2 | Sales of Assets .......................................................................... | 40 |
| 7.5 | Liquidation Incentive Program. ..................................................... | | 43 |
| 7.6 | Wind Down of Subsidiaries. .......................................................... | | 45 |
| | 7.7.1 | Cash............................................................................................ | 45 |
| | 7.7.2 | Collection on Promissory Notes. ............................................. | 45 |
| | 7.7.3 | Real Estate. ............................................................................... | 46 |
| | 7.7.4 | Top Hat Funds.......................................................................... | 47 |
| | 7.7.5 | Retained Claims. ....................................................................... | 48 |
| | 7.7.6 | Other Personal Property Assets. .............................................. | 49 |
| 7.8 | Other Assets. ................................................................................... | | 50 |
| 7.9 | Distributions.................................................................................... | | 50 |
| | 7.9.1 | Segregated Account. ................................................................. | 50 |
| | 7.9.2 | Timing. ...................................................................................... | 50 |
| 7.10 | Responsible Person. ........................................................................ | | 51 |
| 7.11 | Other Employees.............................................................................. | | 52 |
| 7.12 | Disbursing Agent. ........................................................................... | | 53 |
| 7.14 | Exemption From Certain Transfer Taxes. ....................................... | | 53 |
| | 7.21.1 | Notice Generally. ..................................................................... | 56 |
| | 7.21.2 | Notice Procedure. ..................................................................... | 56 |
| | 7.22.1 | U.S. Trustee Fees. ..................................................................... | 56 |
| | 7.22.2 | Post-Confirmation Reports. ..................................................... | 56 |
| | 7.22.3 | Final Decree. ............................................................................. | 57 |
| 7.23 | Proofs of Claim; Objections to Claims. .......................................... | | 57 |
| | 7.23.1 | Time for Filing Proofs of Claim. ............................................. | 57 |
| | 7.23.2 | Ownership and Transfers of Claims. ....................................... | 57 |
| | 7.23.3 | Amendments to Claims. ............................................................ | 58 |
| | 7.23.4 | Time for Filing Objections....................................................... | 58 |
| | 7.23.5 | Who May File Objections to Claims ....................................... | 59 |
| | 7.26.1 | Treatment of Executory Contracts and Unexpired Leases. ..... | 59 |

Case 09-54511 Doc# 416 Filed: 01/07/10 Entered: 01/07/10 17:49:07 Page 3 of 86
S:\...\...\...\DS\Disclosure# v9 (EH).docx

ii    DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION DATED JANUARY 7, 2010

| | | | |
|---|---|---|---|
| | 7.26.2 | Assumption of Executory Contracts and Unexpired Leases | 60 |
| | 7.26.3 | Effect of Assumption. | 60 |
| | 7.26.4 | Adding and Removing. | 60 |
| | 7.26.5 | Defaults. | 60 |
| | 7.26.6 | Assumption of Executory Contracts and Unexpired Leases. | 60 |
| | 7.26.7 | Rejection of Executory Contracts and Unexpired Leases | 61 |
| | 7.26.8 | Rejection Claims. | 61 |

ARTICLE VIII. EFFECTS OF CONFIRMATION; RESERVATION OF RIGHTS ....... 61

| | 8.1.1 | All Retained Claims Are Preserved. | 61 |
|---|---|---|---|
| | 8.1.2 | Specific Retained Claims That Might Be Pursued. | 62 |
| | 8.1.3 | Investigation and Prosecution of Retained Claims. | 63 |
| | 8.5.1 | Binding Effect of Plan. | 64 |
| | 8.5.2 | Revesting. | 65 |
| | 8.5.3 | Full Satisfaction of Claims and Interests. | 65 |

ARTICLE IX. RISK FACTORS .......... 65

| | 9.1 | Claims in Excess of Estimates | 65 |
|---|---|---|---|
| | 9.2 | Estimation of Claims and Distribution Risks. | 65 |
| | 9.3 | Bankruptcy Risks. | 66 |
| | 9.4 | Subsidiary Closures. | 66 |
| | 9.5 | Value of Inventory | 66 |
| | 9.6 | Collection Risks | 67 |
| | 9.7 | Purchase Transaction Risks | 67 |
| | 9.8 | Environmental Compliance and Remediation. | 67 |

ARTICLE X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN........... 67

ARTICLE XI. ....... 72

VOTING PROCEDURES AND REQUIREMENTS........ 72

ARTICLE XII. CONFIRMATION PROCEDURES; OBJECTIONS TO CONFIRMATION ........ 74

| | 12.1 | Confirmation Hearing. | 74 |
|---|---|---|---|

ARTICLE XIII. BEST INTERESTS TEST ....... 78

ARTICLE XIV. FEASIBILITY ....... 81

ARTICLE XV. POST-CONFIRMATION MANAGEMENT ....... 81

ARTICLE XVI. Plan Interpretation........ 81

tth
S:\...\v..\...\RD-45\DS\Disclosure#...v5 (TGH).docx

iii     DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF
REORGANIZATION DATED JANUARY 7, 2010

# ARTICLE I.

## INTRODUCTION[1]

ATI Liquidating, Inc., formerly known as Aviza Technology, Inc. ("ATI"), AI Liquidating, Inc. formerly known as Aviza, Inc. ("Aviza") and TTI Liquidating, Inc., formerly known as Trikon Technologies Inc. ("TTI" and collectively with ATI and Aviza, the "Debtors" or the "Company"), each are Delaware corporations which filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on June 9, 2009. The Debtors hereby present their DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION (DATED JANUARY 7, 2010) (the "Disclosure Statement") in connection with the solicitation of acceptances of DEBTORS' JOINT PLAN OF LIQUIDATION (DATED JANUARY 7, 2010) (the "Plan") and pursuant to the provisions of chapter 11 of the Bankruptcy Code.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION CONCERNING YOUR CLAIMS OR INTERESTS. PLEASE READ THIS DOCUMENT WITH CARE. FOR THE CONVENIENCE OF CREDITORS AND EQUITY SECURITY HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF CONTROLS OVER THIS SUMMARY. IF ANY INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. IN ADDITION, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, THE INFORMATION CONTAINED HEREIN MAY BE INCOMPLETE OR INACCURATE. FOR THE FOREGOING REASONS, THE DEBTORS AND THEIR PROFESSIONALS ARE UNABLE TO WARRANT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.**

**THE PROFESSIONALS REPRESENTING THE DEBTORS HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED THE FACTUAL INFORMATION CONTAINED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. YOU SHOULD CONSULT WITH YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING YOUR CLAIMS OR INTERESTS.**

**THE SECURITIES AND EXCHANGE COMMISSION HAS NOT APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT, OR DETERMINED IF IT IS TRUTHFUL OR COMPLETE.**

---

[1] Terms not defined herein shall have the meaning ascribed to them in the DEBTORS' JOINT PLAN OF LIQUIDATION (DATED JANUARY 7, 2010).

Case 09-54511 Doc# 416 Filed: 01/07/10 Entered: 01/07/10 13:19:01 Page 5 of 86

# ARTICLE II.

## DEFINITIONS

All definitions contained in Article I of the Plan are incorporated herein by reference. Other terms are defined herein for convenience only.

# ARTICLE III.

## SUMMARY OF PLAN TREATMENT

### 3.1 **The Chapter 11 Process.**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide debtors with "breathing space" within which to propose a restructuring of their obligations to third parties. The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprised of all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court (no trustee has been appointed in these Cases), a debtor remains in possession and control of all of its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition operates as an "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case. The Bankruptcy Court can, however, grant relief from the automatic stay, under certain specified conditions or for cause.

A chapter 11 debtor may propose a plan providing for the reorganization of the debtor or, as the Debtors' Plan contemplates, for the orderly liquidation and administration of the assets of the bankruptcy estates. A plan may either be consensual or non-consensual and provides, among other things, for the treatment of the claims of creditors and interests of equity holders.

### 3.2 **Bankruptcy Filing.**

The Debtors commenced their Chapter 11 Bankruptcy Cases on June 9, 2009. This Disclosure Statement and the accompanying Plan constitute the Debtors' proposal for an orderly liquidation of the Debtors' assets.

Case 2:09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 13:19 AM   Page 6 of 86

3.3 **Voting Instructions.**

Article XI below provides instructions for voting on the Plan.

3.4 **Confirmation Hearing.**

The Bankruptcy Court will be asked to schedule a hearing to consider confirmation (approval) of the Plan. Creditors and parties in interest will receive a notice accompanying this Disclosure Statement identifying the date, time and place of the Confirmation Hearing, and identifying the requirements for filing and serving objections, if any, to confirmation of the Plan.

The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

3.5 **Substantive Consolidation.**

The Plan provides for the consolidation of all assets and all liabilities of ATI, Aviza and TTI into a single Estate. This means that, for purposes of Distributions to Creditors under the Plan, the Debtors will be considered to be a single, legal entity. The consolidated assets of each Debtor will be held by the Reorganized Debtors for liquidation by the Responsible Person and available for Distribution to all Creditors regardless of which Debtor was responsible for the debt in the first instance.

The consolidation of the Estates eliminates any inter-company claims between the three (3) Debtors not previously cancelled as well as the guaranties of the obligations of one Debtor by either of the others. Consolidation also ensures that multiple and duplicative claims filed against more than one Debtor will not improperly receive more than one Distribution. In addition, Creditors of the consolidated Estates are combined for purposes of voting on the Plan. If the Bankruptcy Court confirms the Plan, then ATI, Aviza and TTI and their respective Estates will be substantively consolidated for purposes of classification and Distribution under the Plan.

The Debtors believe that substantive consolidation is appropriate in their Cases based on their belief that there may be sufficient cash to pay Allowed Claims in full, and therefore, proposing a separate plan for each of the Debtors is unnecessary and would increase the cost and reduce the efficiency of providing Distributions to Creditors. In other words, if the Estates of ATI, Aviza and

TTI were to be separately administered, three separate plans would have to be filed, and where duplicative Claims were filed against the entities, an objection would have to be filed as to those Claims. Additionally, as set forth in the NOTES TO SCHEDULES OF ASSETS AND LIABILITIES attached to the Schedules filed by ATI and Aviza, ATI is the parent corporation of Aviza, and TTI was formed as a result of a merger in December 2005. Because Aviza was formerly known as and had conducted business as ATI prior, it continued to use the ATI name in many instances, in order to avoid confusion in the marketplace and maintain consistency with those parties with whom it did business. Consolidation of the bankruptcy cases will further enable the Debtors to identify those Creditors of ATI and Aviza who should rightfully be allowed Claims in the single, consolidated case and to distinguish duplicative and unsupported Claims.

In addition, ATI is an affiliate of Aviza, and TTI and owns 100 percent of the outstanding voting securities of Aviza and TTI. Aviza's and TTI's status as wholly-owned subsidiaries makes it practical to join their cases with ATI. Aviza and ATI are co-borrowers under a certain Pre-Petition Secured Credit Facility (discussed below) from the Banks which provided, among other things, a line of credit for working capital purposes for all three companies. The Company prepared consolidated financial statements for all of its subsidiaries. The assets of TTI are of nominal value, and it has few creditors. As of the date of this Disclosure Statement, only two distinct Proofs of Claims have been filed against TTI. Administration of one of the Bankruptcy Cases will affect the other two. Substantive consolidation of the Bankruptcy Cases will facilitate the efficient administration of the Bankruptcy Estates and avoid unnecessary duplication of work performed.

Based upon the facts in this case, the Debtors believe that substantive consolidation is in the best interest of the Creditor body as a whole.

### 3.6 **Means of Implementation of the Plan.**

Following a hearing on September 29, 2009 (the "Sale Hearing"), the Bankruptcy Court approved the sale (the "Sale") of certain of the assets of the Debtors, and the assets and stock of certain of their subsidiaries, to Sumitomo Precision Products, Inc. ("SPP" or the "Purchaser") (the approved Sale to SPP is hereinafter referred to as the "Purchase Transaction"). The Purchase Transaction closed on October 16, 2009. The consideration, valued by the Debtors at approximately

$58.0 million, included cash, certain promissory notes and the assumption of certain liabilities. The Debtors' Plan will be implemented by distributing cash received from the promissory notes (see discussion at Section 7.72 below), liquidation of the Debtors' remaining assets (see summary at Section 7.4 below), and the wind down and upstreaming of cash by direct and indirect subsidiaries of Aviza to the Debtors.

After payment of or reserve for asserted Secured Claims, the balance of the proceeds from the Purchase Transaction (the "Sale Proceeds") and from the liquidation of the Debtors' remaining assets will be used to pay Allowed Claims pursuant to the priorities of the Bankruptcy Code as provided in the Plan.

3.7 **Specific Treatment.**

A summary of the treatment of the various Classes of Claims and Interests is set forth below:

| Claims/Interests | Treatment |
|---|---|
| Administrative Claims | Estimated Administrative Claims are included in the Cash Collateral Budget. Except to the extent that the holder of a particular Administrative Claim has agreed to a different treatment of such Claim, each holder of an Allowed Administrative Claim will be paid in cash, in full upon the later of (a) the Effective Date; (b) if such Claim is initially a Disputed Claim or an order of the Court is required prior to any payment, upon the ultimate allowance of such Claim by a Final Order of the Bankruptcy Court; and (c) if such Claim is incurred after the Petition Date in the ordinary course of the Debtors' business, within such time as payment is due pursuant to the terms giving rise to such Claim. The Effective Date will be the first business day following the date on which the Order of Confirmation becomes a Final Order. |
| Tax Claims | Except to the extent that the holder of a particular Tax Claim has agreed to a different treatment of such Claim, after payment in full of (a) the Allowed Secured Claim of the Banks; (b) other Allowed Secured Claims, if any, or reservation otherwise for such Allowed Secured Claims, to the extent of the lien on the particular collateral underlying such lien; and (c) all Allowed Priority Claims, each holder of an Allowed Tax Claim will receive a cash payment equal to the Allowed Amount of such Claim plus interest on such Allowed Claim at the rate of interest determined under applicable non- |

5    DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION DATED JANUARY 7, 2010

| Claims/Interests | Treatment |
|---|---|
| | bankruptcy law pursuant to Bankruptcy Code Section 511, from the Petition Date through the date of payment in full; provided that (a) no such payment will be made longer than five (5) years from the Petition Date; (b) no holder of an Allowed Tax Claim will be treated in a manner less favorable than any Allowed Claim in Class 8; and (c) with respect only to Tax Claims based on accrued real property taxes assessed against and secured by the Scotts Valley Property, such Allowed Tax Claims will not be paid until such property is sold. |
| Class 1: Secured Claim of the Banks | The holder of the Allowed Claim of the Banks, to the extent such Allowed Claim constitutes a Secured Claim, will be paid in cash. The Allowed Secured Claim of the Banks will be paid as soon as reasonably practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8. |
| Class 2: Secured Claim of ESI | The holder of the Allowed Claim of ESI, to the extent such Allowed Claim constitutes a Secured Claim, will receive either: (a) the net proceeds from the sale of the Scotts Valley Property at the time of such sale or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim; or (b) such other less favorable treatment as shall be agreed to by the Reorganized Debtor and the holder of such Secured Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8. |
| Class 3: Secured Claim of Iron Mountain | The holder of the Allowed Claim of Iron Mountain, to the extent such Allowed Claim constitutes a Secured Claim, will receive either: (a) the net proceeds from the removal, destruction or disposition otherwise of its collateral as appropriate pursuant to applicable law, at the time of such disposition or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim; or (b) such other less favorable treatment as shall be agreed to by the |

6 DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF tth REORGANIZATION DATED JANUARY 7, 2010

| Claims/Interests | Treatment |
|---|---|
| | Reorganized Debtors and the holder of such Secured Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8. |
| Class 4: Other Secured Claims | Class 4 consists of any other holders of Allowed Secured Claims (each of which will be its own subclass under Class 4). Each holder of an Allowed Class 4 Secured Claim, to the extent there are any such Allowed Class 4 Secured Claims, will receive on the Effective Date, at the Reorganized Debtors' option: (a) the net proceeds from the sale of its collateral at the time of such sale or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim; (b) the return of its collateral; or (c) such other less favorable treatment as may be agreed to by the Reorganized Debtors and the holder of such Secured Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8. |
| Classes 5 & 6: Employee Priority Claims | Except to the extent that the holder of a particular Priority Claim entitled to priority under Sections 507(a) (4) and (5) of the Bankruptcy Code has agreed to a different treatment of such Claim, each holder of such Claim will receive, as soon as reasonably practicable after payment in full of (a) the Banks' Allowed Secured Claim, and (b) other Allowed Secured Claims, if any, or reservation otherwise for such Allowed Secured Claims, to the extent of the lien on the particular collateral underlying such lien, deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim plus interest calculated at the Legal Rate from the Petition Date through the date of payment in full. |
| Class 7: Top Hat Claims | The holders of Allowed Class 7 Claims will retain their rights under the Top Hat Plan and treatment of such Claims will be as afforded under the Top Hat Plan. Distributions made from the Top Hat Funds, if any, will be subject to the Reorganized Debtors' withholding and payment of applicable federal and state withholding income tax amounts to the appropriate taxing authorities (as required). |
| Class 8: Timely Filed Unsecured Claims | After payment in full of Allowed Claims in Classes 1 through 6, and payment or reserve for the Liquidation Incentive Accruals, each holder of a |

C:\A09\PF\PH7 11DS\DisclosureStatement(TH).doc

| Claims/Interests | Treatment |
|---|---|
| | Class 8 Allowed Timely Filed Unsecured Claim will receive its Pro Rata share of Available Cash, if any, pursuant to one or more Distributions until the depletion of the Available Cash or payment in full. In addition, if the Allowed Claims in Class 9 are paid in full, then each holder of an Allowed Claim in Class 8 will receive interest on such Allowed Claim from the Petition Date through the date of payment in full to the extent of remaining Available Cash, on a Pro Rata basis with all other holders of Allowed Claims in Classes 8 and 9 (all at the applicable rate specified in the Plan for such Claims). |
| Class 9: Late Filed Unsecured Claims | Each holder of an Allowed Late Filed Unsecured Claim will receive its Pro Rata share of Available Cash remaining after payment in full of Allowed Claims in Class 8. In addition, if the Allowed Claims in Class 9 are paid in full, then each holder of an Allowed Claim in Class 9 will receive interest on such Allowed Claim from the Petition Date through the date of payment in full to the extent of remaining Available Cash, on a Pro Rata basis with all other holders of Allowed Claims in Classes 8 and 9 (all at the applicable rate specified in the Plan for such Claims). |
| Class 10: Interests (Common Stock Holders) | Each holder of an Allowed Interest in Class 10 will receive, on account of, and in exchange for, its Allowed Class 10 Interest, its Pro Rata share of all Available Cash remaining, if any, after payment in full of Allowed Claims in Class 9, including interest on all Allowed Claims as provided under this Plan and payment or reserve for the Liquidation Incentive Supplement. For purposes of Distribution under the Plan, the Allowed Interests of the holders of the Debtor's common stock will include, and be limited to, the holders of record on the Record Date, any transfers thereafter notwithstanding. |
| Class 11: Interests (Option Holders) | For purposes of Distribution under the Plan, the Allowed Interests of the holders of the Debtors' common stock will include, and be limited to, the holders of record on the Record Date, any transfers thereafter notwithstanding. Accordingly, after the Record Date, holders of the Debtors' options will not receive any Distributions under the Plan. Any unexercised options as of the Record Date will be cancelled. |

/ / /

/ / /

The foregoing is a summary only. Creditors, Equity Security Holders and other parties in interest should review the entirety of this Disclosure Statement and the Plan for a more thorough discussion of the Bankruptcy Cases and the proposed treatment of Claims and Interests.

ARTICLE IV.

THE BANKRUPTCY FILING

On June 9, 2009 (the "Petition Date"), the Debtors filed their respective Voluntary Petitions under chapter 11 of the Bankruptcy Code. Presently, the Debtors are operating as debtors in possession pursuant to the provisions of Bankruptcy Code §§ 1107 and 1108. An Official Committee of Unsecured Creditors (the "Creditors' Committee") was appointed in the Bankruptcy Cases on June 23, 2009, and consists of the following members:

ASML
8555 S. River Parkway
Tempe, AZ 85284-2601
Attn: David Kim

Armanino Mckenna LLP
12667 Alcosta Blvd., Ste 500
San Ramon, CA 94583
Attn: Matthew Perreault

Genmark Automation
1201 Cadillac Court
Milpitas, CA 95035

The Creditors' Committee is represented by the following counsel:

Robert G. Harris, Esq.
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050
Tel: (408) 295-1700
Email: Rob@bindermalter.com

ARTICLE V.

HISTORY AND PRESENT POSTURE OF THE CASE

5.1 **History and Description of the Business.**

The Company is headquartered in Scotts Valley. Prior to the closing of the Purchase Transaction, the Company designed, manufactured, sold and supported advanced semiconductor

capital equipment and process technologies for the global semiconductor industry and related markets.  The Company's customer base was geographically diverse and included both integrated device manufacturers and foundry based manufacturers.  The Company had a broad installed base with approximately 2,500 systems installed worldwide.  The Company operates its manufacturing, sales and support through directly and indirectly wholly owned subsidiaries in the United States, the United Kingdom, France, Germany, Korea, Japan, Malaysia, Singapore, Taiwan, Peoples Republic of China and Israel.  Following the Purchase Transaction, the Debtors changed their names to "ATI Liquidating, Inc.," "AI Liquidating, Inc." and "TTI Liquidating, Inc.," respectively.

5.2     **Events Precipitating the Bankruptcy Filing.**

ATI was a publicly traded company whose stock was traded on the Nasdaq Global Market under the symbol "AVZA."  As of February 3, 2009, ATI had 21,856,473 shares of its common stock outstanding, held by approximately 2,865 stockholders.  ATI is a holding company whose sole assets consist of shares of stock in Aviza and Trikon, its wholly owned subsidiaries.  As of the Petition Date, there were a total of 22 corporate entities in the Aviza family.  Due to the filing of the Bankruptcy Cases, the Nasdaq Stock Market suspended trading of ATI's common stock on June 19, 2009 and subsequently delisted the stock in September 2009.  Presently, the stock is traded only on "pink sheets."

The Company's consolidated balance sheet for the fiscal quarter ending December 26, 2008 lists assets of $89,365,000, liabilities of $69,022,000 and stockholder's equity of $20,343,000.  The Company lost $47,364,000 on sales of $133,189,000 in the fiscal year ending September 26, 2008.  The Company's forecasts for the second quarter of fiscal 2009 were predicated on continued weakness in customer demand.  The Debtors estimate that net sales for the second quarter of fiscal 2009 were in the range of $9.5 million to $11.0 million, with an adjusted net loss in the range of $5.0 million to $6.0 million, excluding restructuring charges estimated in the range of $9.0 million to $10.0 million.

On April 13, 2007, ATI and Aviza entered into a LOAN AND SECURITY AGREEMENT and related documents (collectively, the "Loan Agreement") with United Commercial Bank, East West Bank and ChinaTrust Bank (USA) (collectively defined in the Plan as the "Banks") for a credit

facility (the "Pre-Petition Secured Credit Facility") pursuant to which the Banks provided credit up to approximately $55.0 million under a revolving line of credit (the "Revolving Facility"), an equipment term loan and a real property term loan (the "Real Property Loan"). As of the Petition Date, ATI and Aviza owed the Banks approximately $28.5 million, on the respective notes evidencing the Revolving Facility and the Real Property Loan. These obligations (the "Pre-Petition Secured Obligation") are secured by the assets of ATI and Aviza, but not the assets of TTI or any other directly or indirectly owned subsidiary. On May 20, 2009, the Banks sent a letter to the Company declaring certain provisions of the Loan Agreement to be in default, accelerating the balance due, demanding payment in full of the Pre-Petition Secured Obligations and advising of their intent to exercise their rights and remedies.

Without access to the Pre-Petition Secured Credit Facility, the Company would not be able to operate in the long-term. Prior to the Petition Date, the semiconductor industry had been experiencing, and continued to experience, severe instability. The National Bureau of Economic Research officially declared that the United States entered into a recession in December of 2007 and has remained there since. On November 20, 2008, the Company engaged the investment banking firm of Needham & Company, LLC ("Needham") to assist it in exploring opportunities to sell the Company and/or raise additional equity investment. As the months progressed, it became clear that the only salvation for the Company was a sale of its assets, including the stock or assets of some of its directly or indirectly owned subsidiaries. The continuing rapid decline in new orders and sales being experienced industry-wide coupled with the Banks' demands precipitated the Debtors' filings of their Voluntary Petitions commencing the instant Chapter 11 Bankruptcy Cases.

### 5.3    Significant Events During The Bankruptcy Cases.

#### 5.3.1    Use of Cash Collateral.

Since the Petition Date, the Debtors have been authorized to utilize cash collateral in accordance with budgets approved by the Banks and Orders entered in the Bankruptcy Case. The most recent such order entered on November 20, 2009 is the Cash Collateral Order. The Cash Collateral Order sets forth the terms of the Debtors use of cash collateral and authorizes the Debtors to use cash collateral pursuant to a budget (i.e., the Cash Collateral Budget) through December 2010.

11    DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF

A copy of the Cash Collateral Budget is attached hereto as **Exhibit** "**A**." The Cash Collateral Budget may be subject to, and shall include, further amendment, modification, revision and/or supplementation otherwise as approved by further Court order(s) on the Debtors' or Reorganized Debtors' use of cash collateral. Access to cash collateral enabled the Debtors to maintain their operations through the closing of the Purchase Transaction and will subsequently enable the Debtors to manage the Bankruptcy Cases, administer and liquidate the Estates, wind down and dissolve their subsidiaries, and monitor and manage the collection of the Sale Proceeds.

Additionally, the Banks have agreed in connection with the Debtors' use of cash collateral to subordinate the Banks' Claims to the payment of certain professional fees. Specifically, the Cash Collateral Order provides, *inter alia*, that (1) in the event any of the Debtors' or the Committee's Professionals are not in the Cash Collateral Budget, or exceed their budgeted amounts, they may be paid from cash collateral held by the Debtors in such amounts as allowed by the Court; and (2) all Claims of the Banks whether arising on, before or after the Petition Date, and all liens securing such claims, shall be subordinated to the payment of the following: (i) all statutory fees of the Court and the United States Trustee; (ii) the expenses of the Committee members not to exceed in the aggregate $2,500 per month; (iii) allowed fees and expenses of the Debtors' and the Committee's professionals; and (iv) the compensation and expense reimbursement (other than professional fees and expenses) of a trustee in any superseding Chapter 7 case.

### 5.3.2   The SPP Purchase Transaction.

A summary of the Purchase Transaction was previously provided to Creditors, stockholders and other parties in interest in connection with the Debtors' proposed sale to SPP. Pursuant to the Purchase Agreement with SPP, SPP proposed to purchase certain assets of the Debtors including those assets related to its system, service, parts, spares and upgrade businesses for batch thermal products and technologies, atmospheric-pressure chemical vapor deposition products and technologies, physical vapor deposition products and technologies, chemical vapor deposition products and technologies, and plasma etch products and technologies, as well as its service, parts, spares and upgrade business for atomic layer deposition products and technologies (all as described more fully in the Purchase Agreement, the "Purchased Assets"). In addition, SPP's proposal under

the Purchase Agreement contemplated the assumption of certain liabilities of the Debtors' including certain executory contracts and unexpired leases and the obligations thereunder (the "<u>Assumed Liabilities</u>").

The purchase price (the "<u>Purchase Price</u>") under the Purchase Agreement was comprised of the following three (3) components: (1) $15.0 million of cash subject to certain limited adjustments[2]; (2) a secured recourse promissory note with a maturity date of April 16, 2011 and with an aggregate principal amount of $10.0 million and (3) a secured non-recourse promissory note with a maturity date of April 16, 2011 that had an initial aggregate principal amount of approximately $28.7 million, based upon the inventory and accounts receivable value.[3] The non-recourse promissory note will be payable upon the sale of inventory and collection of accounts receivable that are identified as part of the Purchased Assets.

On September 30, 2009, the Court entered the Sale Order, approving the Purchase Transaction to SPP based on the terms and conditions of the Purchase Agreement. The Purchase Transaction closed on October 16, 2009 (the "<u>Closing</u>").

The Purchase Price was allocated among the Debtors and certain of their subsidiaries. The Debtors are in the process of winding down and closing their subsidiaries, and funds remaining after payment to the subsidiaries' creditors and payment on closure obligations ultimately will be upstreamed to the Debtors' Estates. Based on the cash paid to the Debtors at the Closing, and as authorized by the Bankruptcy Court, the Debtors paid (a) the cure amounts owed to the counterparties whose executory contracts were assumed and assigned to SPP in connection with the Purchase Transaction, (b) fees and expenses incurred by Needham for its services related to the Sale (totaling $611,147), and (c) as of November 2009, approximately $10.2 million to the Banks on account of the Banks' Secured Claim.

The Debtors estimate that the gross proceeds from the Purchase Transaction ultimately may aggregate to approximately $58.0 million. However, such amount may be less depending on certain

---

[2] The $15.0 million of cash was reduced by the value at closing of the Debtors' warranty obligations that were assumed by SPP, the amount of customer deposits and prepayments related to the Purchased Assets, the proration of certain taxes between the Debtors and SPP, and the amount by which the operating liabilities assumed by SPP exceed $5.0 million, and was increased by the value of certain vendor deposits and prepayments.

[3] The promissory notes are described in greater detail below in Section 7.72.

adjustments to the Purchase Price as provided for by the Purchase Agreement and based on the amounts actually paid and collected under the promissory notes over their 18-month maturity term.

The Debtors presently are focused on the collection of the proceeds of the Purchase Transaction, the liquidation of their remaining assets, and the wind down and closing of their subsidiaries and subsequent upstreaming of assets to the Debtors as set forth in the Plan. Given the nature of the Purchased Assets, all final proceeds from the Purchase Transaction may not be realized until 2011 which will influence the timing of the Plan and Distributions contemplated thereunder. The Debtors' current estimate is that the Banks' Secured Claim will be paid in full by September 2010. This is an estimate only based on information available to the Company as of the date of this Disclosure Statement. Once the Banks' Secured Claim is paid in full, Available Cash will be distributed to unsecured Creditors as provided by the Plan. Thus, based on this preliminary estimate, the earliest date that a preliminary Distribution might occur to general unsecured Creditors is the last quarter of 2010. The time by which the Plan will be fully performed and final Distributions are made to general unsecured Creditors is currently unknown. As discussed herein, the promissory notes issued in connection with the SPP Purchase Transaction do not mature until April 16, 2011. The Plan also provides for the wind down and closure of the Debtors' subsidiaries with the upstreaming of cash on account of the Debtors' stock interest in such subsidiaries. The subsidiaries located in other countries are subject to that jurisdiction's legal requirements for the wind down and closure of a company. Accordingly, the Debtors cannot currently provide an estimate for the timetable by which the Plan will be fully consummated. While the cases are in chapter 11 however, the Debtors will be filing quarterly reports with the Bankruptcy Court which will provide updates on the status of the Debtors' liquidation efforts, among other reporting matters. The Creditors' Committee and its counsel will also remain in place for the duration of the Plan (until such time as Creditors are paid in full).

### 5.3.3   The Low-K Patents Transaction.

Also at the Sale Hearing, the Debtors conducted a Court-supervised auction wherein the Debtors sold certain components of their Low-K Patent portfolio. Following the auction at the Sale Hearing, the Bankruptcy Court approved the sale of the Low-K Patents to Applied Materials, Inc.

("AMAT") (the approved sale of the Low-K Patents is hereinafter referred to as the "Low-K Patents Transaction," as defined in the Plan).[4]  The Low-K Patents Transaction closed on October 16, 2009. As consideration for its purchase of the Low-K Patents, AMAT paid $1.1 million.  Pursuant to the ORDER GRANTING DEBTORS MOTION TO HOLD AN AUCTION TO SELL CERTAIN ADDITIONAL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Low-K Patents Order") entered on October 15, 2009, the Debtors paid the net proceeds of the Low K Patents Transaction (net of the actual and necessary costs and expenses directly related to such sales, and a proportional share for the Debtors' subsidiaries) in the amount of $1.09 million, directly to the Banks as consideration for the Banks' Allowed Secured Claim.

### 5.3.4  Excess Equipment Sales.

On October 30, 2009, the Court entered its ORDER AFTER HEARING ON MOTION FOR ORDER: (1) APPROVING CERTAIN PROTOCOLS FOR THE SALE OF CERTAIN FIXED ASSETS AND EQUIPMENT; (2) AUTHORIZING DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (3) AUTHORIZING DEBTOR TO ABANDON PERSONAL PROPERTY OF INCONSEQUENTIAL VALUE AND BENEFIT TO ESTATES (defined in the Plan as the "Excess Equipment Order") authorizing the Debtors to sell[5] any and all of certain miscellaneous fixed assets via one or more direct, private sales (the "Excess Equipment Sales" and collectively with the Purchase Transaction and the Low-K Patents Transaction, the "Sales Transactions," as defined in the Plan), without need for further Court order, upon such terms as the Debtors determine are reasonable in the exercise of their business judgment.  Pursuant to the Excess Equipment Order, all the proceeds from the Excess Equipment Sales will be paid to the Banks after a deduction for all actual and necessary expenses incurred directly in relation to such sales.  As of December 23, 2009, the Debtors have generated $131,800 in proceeds from the Excess Equipment Sales which was paid to the Banks as consideration for the Banks' Allowed Secured Claim, net of deductions for costs and expenses.

In addition to the above-described sales, the Debtors have also sold certain equipment and

---

[4] The Low-K Patents were sold free and clear of all liens, claims, encumbrances and other interests, with any such liens, claims, encumbrances or interests to attach to the proceeds received thereof.
[5] The Excess Equipment Order provides that such sales shall be free and clear of all liens, claims, encumbrances and other interests, with any such liens, claims, encumbrances or interests to attach to the proceeds received thereof.

1  other assets in the ordinary course of their business such as unused and outdated equipment and

2  demonstration tools.

3       The Debtors now seek to conduct an orderly liquidation and administration of the assets of

4  their Estates. Accordingly, the Plan provides for Distribution of the Debtors' cash on hand,

5  including the proceeds of the Sales Transactions, in accordance with the priorities established by the

6  Bankruptcy Code.

7  ### 5.3.5    Retention of Professionals.

8       Since the Petition Date, the Debtors have employed the following professionals to assist in

9  their reorganization efforts: (i) Murray & Murray, A Professional Corporation, as general bankruptcy

10  counsel; (ii) Latham & Watkins, LLP, as special and corporate counsel; (iii) Gifford, Krass, Groh,

11  Sprinkle, Anderson & Citkowski, P.C. as special patent counsel; (iv) Wilson Sonsini Goodrich &

12  Rosati as special real estate counsel; (v) the Law Offices of Matthew A. Joseph as special

13  intellectual property counsel; (vi) Mohler, Nixon & Williams as accountants; (vii) Matthew Shelton,

14  dba J.R. Parrish-Santa Cruz as real estate broker; and (viii) Needham as financial advisor. In

15  addition, pursuant to the Debtors' motion, the Court appointed Omni Management Inc. as the

16  claims' and noticing agent for the Clerk of Court for the United States Bankruptcy Court, Northern

17  District of California in the Bankruptcy Cases. The Creditors' Committee has employed Binder &

18  Malter LLP as its counsel during the Bankruptcy Cases.

19  ### 5.3.6    Allowance of Fees of Court-Appointed Professionals.

20       On November 9, 2009, the Court entered its ORDER RE FIRST APPLICATION FOR INTERIM

21  COMPENSATION AND REIMBURSEMENT OF EXPENSES BY ATTORNEYS FOR DEBTORS, thereby

22  approving and allowing attorneys' fees to the Debtors' bankruptcy counsel in the sum of $934,573

23  for services rendered to the Debtors from June 9, 2009 through September 30, 2009, and authorizing

24  payment of $31,914 as reimbursement for expenses incurred in representation of the Debtors from

25  June 9, 2009 through September 30, 2009. The Debtors' bankruptcy counsel applied its pre-petition

26  advance retainer in the sum of $191,034 to its awarded fees, and the Debtors paid the balance of

27  such fees and expenses in the amount of $743,539.

28       Also on November 9, 2009, the Court entered its ORDER RE FIRST AMENDED APPLICATION

FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES BY SPECIAL COUNSEL FOR DEBTORS (LATHAM & WATKINS LLP), thereby approving and allowing attorneys' fees to the Debtors' special corporate counsel in the sum of $430,457 for services rendered to the Debtors from June 9, 2009 through September 30, 2009, and authorizing payment of $1,387 as reimbursement for expenses incurred in representation of the Debtors from June 9, 2009 through September 30, 2009. The Debtors' special corporate counsel applied its pre-petition advance retainer in the sum of $287,156 to its awarded fees, and the Debtors paid the balance of such fees and expenses in the amount of $143,301.

On November 12, 2009, the Court approved and allowed the fees and expenses incurred by the Committee's counsel from June 9, 2009 through September 30, 2009, in the amounts of $143,640 and $1,422 respectively, pursuant to the ORDER GRANTING FIRST APPLICATION FOR APPROVAL OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES BY COUNSEL FOR OFFICIAL UNSECURED CREDITORS' COMMITTEE. In accordance with that order, the Debtors paid the Committee's counsel the aggregate of $145,062.

On November 19, 2009, the Court entered the FIRST APPLICATION FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES BY SPECIAL COUNSEL FOR DEBTORS (LAW OFFICES OF MATTHEW A. JOSEPH) approving and allowing attorneys' fees to the Debtors' special corporate counsel in the sum of $11,760 for services rendered from June 9, 2009 through October 26, 2009, which subsequently was paid by the Debtors.

In addition to the foregoing and as discussed above, upon the Closing of the Sale, the Debtors paid Needham its fixed fee in the amount of $600,000 and its expenses in the amount of $11,147.

### 5.3.7    Appointment of Responsible Individual.

Pursuant to an order entered by the Bankruptcy Court on June 11, 2009, Patrick C. O'Connor was appointed the Responsible Individual in the Bankruptcy Cases. As of the date of this Disclosure Statement, Mr. O'Connor holds the positions of Chief Executive Officer, Chief Restructuring Officer and Secretary of the Debtors. Mr. O'Connor is also a member of the board of directors of the Debtors.

/ / /

### 5.3.8 Rejection of Leases.

On August 11, 2009, the Court entered its ORDER AUTHORIZING DEBTORS TO REJECT EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365 AND TO ESTABLISH BAR DATE FOR REJECTION CLAIMS (GENERAL ELECTRIC CREDIT CORPORATION ) (the "GECC Rejection Order"), and on August 14, 2009, the Court entered its ORDER AUTHORIZING DEBTORS TO REJECT EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365 AND TO ESTABLISH BAR DATE FOR REJECTION CLAIMS ( IBM CREDIT LLC) (the "IBM Rejection Order"), thereby authorizing the Debtors to reject certain agreements for the lease of equipment which the Debtors determined was not necessary for the Company's operations.

The Plan further provides for the Debtors to reject all pre-petition executory contracts and unexpired leases that are not: (a) assumed or rejected prior to Confirmation; (b) the subject of a pending motion to assume filed prior to Confirmation; or (c) assumed pursuant to the Plan. Such executory contracts and unexpired leases to be rejected include, without limitation, those listed on Exhibit "C" attached to the Plan.

### 5.3.9 IBM Corporation Relief From Stay.

On August 7, 2009, IBM Corporation filed its MOTION (1) FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D), (2) FOR ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 361, (3) TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT PURSUANT TO 11 U.S.C. § 365(D), AND (4) FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM PURSUANT TO U.S.C. § 503(B) (the "Relief From Stay Motion") requesting the Court grant relief from the automatic stay to enable IBM Corporation to terminate a certain Statement of Work between IBM Corporation and ATI, based upon ATI's alleged failure to pay pre-petition and post-petition payments. The Debtors presently are current on all post-petition payments under the Statement of Work, and IBM Corporation has continued the hearing on the Relief From Stay Motion subject to the Debtors staying current on their post-petition payments. Presently, the Relief From Stay Motion is set for hearing on January 27, 2010. As discussed below in Subsection 7.26.7, the Debtors intend to reject the IBM Corporation Statement of Work as of the Effective Date.

///

### 5.3.10  Other Bankruptcy Administration Matters.

On June 10, 2009, this Court entered its ORDER AUTHORIZING AND DIRECTING JOINT ADMINISTRATION OF ESTATES in the Debtors' cases.

The Debtors also sought and received an order from the Bankruptcy Court modifying the financial reporting requirements of Bankruptcy Rule 2015.3.  The Debtors have filed all Monthly Operating Reports, and they are current in their payments of the United States Trustee's fees.  On December 21, 2009, Aviza filed its most recent Monthly Operating Report for the month ending November 2009 (the "November MOR"), a copy of which is attached hereto as **Exhibit "B"**.

The Debtors have responded to information requests by the Office of the United States Trustee and have attended meetings as requested.

After notice and a hearing on December 16, 2009, the Court entered its ORDER GRANTING SECOND MOTION FOR ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTORS MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF, extending the dates by which the Debtors solely may file a plan and solicit acceptances thereto, to March 8, 2010 and May 6, 2010 respectively.

### 5.4  Assets and Liabilities.

As discussed above, the Debtors are operating pursuant to an approved cash collateral budget with the consent of the Banks and approval of the Bankruptcy Court.  Cash in excess of budgeted amounts is used to pay down the debts to the Banks.  As of November 27, 2009, the Debtors' cash on hand was approximately $3.1 million.  As discussed above, the Debtors hold two promissory notes issued in connection with the SPP Purchase Transaction which will result in payments potentially through the maturity date of April 16, 2011.  The Debtors' remaining assets to be liquidated include the Debtors' real property at 440 Kings Village Road, Scotts Valley, CA 95066 (defined in the Plan as the "Scotts Valley Property") and the manufacturing facilities located thereon, various product lines, equipment and inventory, stock in subsidiaries of the Debtors, and certain avoidance claims and potential causes of action against third parties which the Debtors are currently investigating.[6]  The Debtors have continued to market the Scotts Valley Property for sale

---

[6] The Debtors' remaining assets are described in greater detail below in Section 7.7

th
C:\AO9\P5460.1 DS\Disc Stmt 4 (TH).doc
19.  DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION DATED JANUARY 7, 2010

and already have received an offer to purchase the Scotts Valley Property, to which the Debtors have produced a counter-offer.  In addition to the above, the Debtors estimate that they also have up to $408,000 in account and other receivables.

The Debtors have not yet undertaken a review of all Claims, and all bar dates for Claims have not yet been established (e.g., for certain Rejection Claims).  Aviza's Monthly Operating Report for the month ending November 27, 2009[7] estimates allowed claims based on the Company's books and records as follows:

Secured Claims:  $19,530,986;

Priority Claims (other than taxes):  $182,452;

Priority Tax Claims:  $68,893; and

General Unsecured Claims:  $9,875,191.

Unpaid professional fees, which constitute Administrative Claims, through November 2009, total an estimated $511,000.  These amounts remain subject to Bankruptcy Court approval upon duly filed applications for compensation.

Based on the above amongst other items, the Debtors estimate that their total liabilities through November 27, 2009 approximate $45.8 million.  This estimate does not include Rejection Claims that may be filed following the filing of this Disclosure Statement and the Plan.  If Claims filed by Creditors are Allowed in amounts in excess of the above estimates (see discussion of particular Creditor groups below), the total liabilities may vary significantly which would impact the amount of any Pro Rata Distribution to that class under the Plan.

### 5.4.1    The Debtors' Secured Debts.

As of the Petition Date, searches of the public records of the California and Delaware Secretary of State offices and the public records of the County of Santa Cruz revealed six (6) creditors asserting liens on certain assets (discussed below).

### 5.4.1.1.    The Banks

United Commercial Bank filed blanket liens against both ATI and Aviza, as well as liens against their specific equipment and real property fixtures, all to reflect the Banks' security interests

---

[7] The November MOR reports through November 27, 2009.

Case: 09-54511    Doc# 446    Filed: 01/07/10    Entered: 01/07/10 17:53:08    Page 24 of
86

with respect to the Pre-Petition Secured Obligation. The Banks' liens attached to the proceeds of the Purchase Transaction with the same extent and priority as existed as of its Closing. As of January 2010, the Banks have indicated to the Debtors that they are owed approximately $18.7 million, out of which $12.2 million is owed under the Revolving Facility and $6.5 million is owed under the Real Property Loan. While the Debtors do not dispute the principal owing to the Bank, the Debtors have not yet had the opportunity to fully review the Banks' Claim, including amounts that may have been included for interest, fees and other costs. Upon initial review, the Debtors believe that approximately $1.6 million received from the Debtors may have been applied by the Banks to interest, fees and costs. In the event of an objection to the Banks' Claim (for which all rights are reserved), the amount of the Banks' Allowed Secured Claim will be determined by a Final Order.

### 5.4.1.2. Environmental Systems Inc. ("ESI")

A title report from the Santa Cruz County Recorder's Office on the Scotts Valley Property indicates that ESI filed and recorded a mechanic's lien against such property. Because the Scotts Valley Property was not included as a Purchased Asset in the Sale, any liens upon such property did not attach to any Purchased Assets included in the Sale.

ATI and Aviza included ESI with a disputed claim in the amount of $30,986 in each of their Schedule D, and ESI filed an unsecured claim in the amount of $30,986 based on "services provided." The Debtors presently are conducting an investigation relative to the extent of the validity of ESI's Claims and purported lien. If appropriate, the Debtors or Reorganized Debtors may file a complaint to determine the validity, priority or extent of ESI's purported lien and/or to avoid such lien. Such a complaint would represent a Retained Claim as discussed in Subsection 7.7.5 below.

The Debtors anticipate that they will sell the Scotts Valley Property pursuant to the procedures set forth in the Plan. To the extent ESI's lien is determined to be valid and ESI holds a valid Secured Claim, such Claim will be paid from the net proceeds of the sale of the Scotts Valley Property as a Class 2 Claim with the same extent, priority and validity of the lien securing such Allowed Claim, as discussed in Section 6.4 below. In the event ESI is determined not to have a valid lien, it will be treated in Class 8 along with other Allowed general, unsecured Claims.

Case 09-54511 Doc# 446 Filed: 01/07/10 Entered: 01/07/10 17:39:01 Page 25 of 86

### 5.4.1.3. ASML U.S., Inc. and Related Entities (collectively, "ASML")

ASML filed a judgment lien in California based upon its judgment rendered against ATI on August 20, 2008 in the case entitled *ASML U.S. Inc. et al. v. Aviza Technoloqv. Inc., Case No. CPF-08-508533*. On September 4, 2009, ASML's judgment lien was released.

A title report from the Santa Cruz County Recorder's Office on the Scotts Valley Property indicates that ASML also filed and recorded an abstract of judgment against that property. On or about September 4, 2009, ASML released the lien.

ATI and Aviza included ASML with a disputed claim in the amount of $609,540 in both Schedule D and Schedule F. Following the removal of its liens as referenced above, ASML filed Proofs of Claim in each of the Bankruptcy Cases asserting a secured claim in the amount of $586,735. In light of the release of ASML's liens, the Debtors believe that ASML's Claim, to the extent it is an Allowed Claim, constitutes an Unsecured Claim under Class 8 as discussed below. If appropriate and to the extent ASML does not amend its Claim, the Reorganized Debtors will object to the Claim.

### 5.4.1.4. General Electric Credit Corporation of Tennessee ("GECC")

GECC filed a protective lien based on its lease of specific electronic and test equipment to ATI. However, pursuant to the GECC Rejection Order, the Debtors rejected that master lease agreement with GECC. Furthermore, the GECC Rejection Order granted limited relief from the automatic stay to GECC to enable it to collect the equipment from ATI's premises. GECC has since repossessed its equipment. On October 21, 2009, GECC terminated its lien.

### 5.4.1.5. IBM Credit LLC ("IBM Credit")

IBM Credit filed 29 UCC-1 Financing Statements starting on November 10, 2005. Each such statement was filed as a precautionary filing under UCC 9-505 and identified specific leased equipment of the Debtors as collateral. Previously, ATI and IBM Credit entered into a master lease and a number of lease supplements (each constituting a separate lease for equipment) whereby ATI leased computer equipment from IBM Credit which serve as the basis for its UCC filings.

Subsequently, pursuant to the IBM Rejection Order, the Debtors rejected 13 specific lease supplements which the Debtors determined were not necessary for the Company's operations, and IBM Credit repossessed the equipment underlying each of those supplements.

The Debtors did not assume and assign any of the lease agreements and corresponding supplements with IBM Credit to SPP in the Purchase Transaction nor did they include any of the equipment subject to IBM Credit's financing statements as Purchased Assets in the Sale.

The Debtors believe that the remaining subject lease supplements constitute true lease agreements between the parties. The Debtors do not believe that IBM Credit holds any valid liens against the Debtors' assets and are presently conducting an investigation relative thereto. If appropriate, the Debtors or Reorganized Debtors may file a complaint to determine the validity, priority or extent of each lien and/or to avoid each such lien. Such a complaint would represent a Retained Claim as discussed in Subsection 7.7.5 below. To the extent IBM Credit's liens are each determined to be valid and IBM Credit possesses a valid Secured Claim, IBM Credit's Allowed Secured Claim will be paid as a Class 4 Claim with the same extent, priority and validity of the liens securing such Allowed Claim based on the value of the collateral underlying its liens, as discussed in Section 6.6 below.

### 5.4.1.6. Bank of America, N.A. ("BofA")

BofA previously held a blanket lien to secure an obligation that was satisfied prior to the Petition Date. On August 21, 2009, BofA's lien was terminated.

### 5.4.1.7. Iron Mountain Information Management, Inc. ("Iron Mountain")

While it did not file any UCC lien against the Debtors, Iron Mountain filed a Claim in the aggregate amount of $16,402, $4,743 of which is purported to be secured by a warehouseman's lien pursuant to California Commercial Code Sec. 7209, in 4,743 boxes in Iron Mountain's storage facility.

The Debtors presently are conducting an investigation relative to the extent of the validity of Iron Mountain's Claim and purported lien. If appropriate, the Debtors or Reorganized Debtors may file a complaint to determine the validity, priority or extent of Iron Mountain's purported lien and/or

to avoid such lien. Such a complaint would represent a Retained Claim as discussed in Subsection 7.7.5 below.

To the extent Iron Mountain's lien is determined to be valid and Iron Mountain possesses a valid Secured Claim, Iron Mountain's Allowed Secured Claim will be paid as a Class 3 Claim with the same extent, priority and validity of the lien securing such Allowed Claim based on the value of the collateral underlying its lien, as discussed in Section 6.5 below.

### 5.4.1.8.    Other

A preliminary review of Claims filed against the Debtors indicates that WebEx Communications Inc. ("WebEx") filed a Claim in the amount of $35,473 which indicates that WebEx reserves its rights to a secured claim to the extent of any rights of setoff or recoupment that it may have against the Debtors. The Debtors do not believe that WebEx holds any rights of setoff or recoupment against the Debtors, and to the extent the Debtors agree with the amount asserted by WebEx's Claim, it should be afforded general, unsecured status. The Santa Cruz County Tax Collector filed a Claim in the amount of $153,122 asserting both a secured and priority Claim for unpaid real property taxes which the Debtors have paid.

### 5.4.2    The Debtors' Unsecured Debts.

The Debtors estimate Allowed general unsecured Claims will approximate $14.0 million.[8] This estimate does not account for (1) all Claims arising from the rejection of executory contracts and unexpired leases where the bar date for filing a Rejection Claim has yet to expire or has not yet been established, or (2) Claims included in the Debtors' Amended Schedules, for which the Claims Bar Date is January 11, 2010.

Based on a very preliminary review of general unsecured Claims filed against the Debtors, several are noted below where the asserted claim varies materially from the amount the Debtors believe is owing. To the extent such Creditors do not agree to amend their Claim, the Debtors intend to object to the asserted Claim.

**IPS, Ltd. ("IPS")** was scheduled by the Debtors with a disputed, contingent and unliquidated Claim in the amount of $0.0. IPS has filed a Claim in the amount of $86,896,942

---

[8] This amount does not include the amount of the Allowed Top Hat Claims.

which is disputed. The Claim is based upon a complaint for, *inter alia*, the alleged misappropriation of trade secrets, filed in the United States District Court, Central District of California by IPS against ATI, commencing Case No. CV 06-2200 FMC (JWJx) (the "IPS Action") which remains pending. The Debtors believe that neither IPS' Claim nor the allegations set forth in the IPS Action are valid. Accordingly, to the extent that IPS does not amend its Claim or the Debtors and IPS do not resolve all disputes over the Claim otherwise, the Debtors intend to file an objection to this Claim.

**Alliance Contract Manufacturing SDN Bhd ("Alliance")** was scheduled by the Debtors with a disputed, contingent and unliquidated Claim in the amount of $645,906. Alliance has filed a claim in the amount of $1,344,579 which is disputed. Alliance's Claim alleges that Alliance incurred costs pursuant to orders for certain goods placed by ATI pursuant to a memorandum of understanding between Alliance and ATI. The Debtors neither received the benefit of any goods alleged in the Claim, nor do they believe that the costs incurred by Alliance aggregate to the amount asserted. Moreover, the Debtors believe that third-parties, including SPP, are presently using the goods which are the subject of Alliance's Claim, and therefore, that the Claim amount should be mitigated significantly. Accordingly, to the extent that Alliance does not amend its Claim or the Debtors and Alliance do not resolve all disputes over the Claim otherwise, the Debtors intend to file an objection to this Claim.

**Aviza Technology, gmbh (Germany) ("AT Germany")**, which is a subsidiary of ATI based in Dresden, Germany, filed a Claim after the Claims Bar Date for intercompany transfers in the amount of $8,163,825 based upon alleged amounts owed pursuant to internal orders placed by ATI. Notwithstanding the fact that such Claim was not timely filed, the Debtors believe, and AT Germany's Proof of Claim indicates, that AT Germany owes certain amounts to the Debtors and that, at a minimum, the Debtors are due a significant offset of this Claim. The Debtors further believe that they will resolve this Claim in cooperation with AT Germany which will result in a withdrawal or amendment to the Claim. To the extent that AT Germany does not amend its Claim or the Debtors and AT Germany do not resolve all disputes over the Claim otherwise, the Debtors intend to file an objection to this Claim.

**GECC** filed a Claim against the Debtors in the aggregate amount of $1,565,140 based on the

DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF ...

alleged loss value of leased equipment and alleged rent and other sums purportedly due pursuant to a certain master lease agreement. GECC's Claim asserts that $70,553 of the Claim amount is an administrative expense claim. As discussed above, however, the Debtors rejected their master lease agreement with GECC effective as of the Petition Date, and therefore, the Debtors will file an objection if necessary on the basis that GECC's claim, to the extent it is Allowed, is entitled to only general unsecured status.

**Ultra Clean Technology ("UCT")** filed a Claim after the Claims Bar Date on October 19, 2009, in the amount of $588,269. Notwithstanding the fact that such Claim was not timely filed, the Debtors believe that UCT previously agreed on the amount of its Allowed Claim, which the Debtors believe to be the amount of $273,898 as indicated in their Schedules. To the extent that UCT does not amend its Claim or the Debtors and UCT do not resolve all disputes over the Claim otherwise, the Debtors intend to file an objection to this Claim.

The above is not a complete summary of disputed claims. As already noted, the Debtors have not yet had an opportunity to review all Claims asserted against the Bankruptcy Estates. Thus, the fact that a Claim is not referred to above does not mean the Claim is not disputed or will not be subject to an objection at the appropriate time. The total allowed Claims in Class 8 will not be finally determined until all Claims bar dates have passed and Claims objections have been resolved or otherwise adjudicated by the Bankruptcy Court.

ARTICLE VI.

CLAIMS AND EQUITY INTERESTS AND TREATMENT UNDER THE PLAN

The Claims against and Interests in the Debtor, and their treatment under the Plan are summarized below.

6.1 **Administrative Claims.**

6.1.1 **Description.**

Administrative Claims, generally, are claims that arise during the pendency of a chapter 11 case and are entitled to priority in payment, pursuant to Section 507(a)(2) of the Bankruptcy Code. Here, these include Claims for: (a) costs or expenses of administration of a kind specified in Section 503(b) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving

the Bankruptcy Estates incurred on or after the Petition Date and through and including Confirmation; (b) Claims under Section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors within 20 days before the Petition Date in which the goods have been sold to the Debtors in the ordinary course of the Debtors' business; (c) any cure amounts that must be paid in connection with the assumption of executory contracts or unexpired leases of the Debtors under Section 365 of the Bankruptcy Code; (d) fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (e) allowed compensation and costs for professional services under Sections 330 and 331 of the Bankruptcy Code or otherwise.

### 6.1.2   Administrative Claims – Estimate.

The Debtors anticipate that the majority of Administrative Claims that will remain unpaid as of the Effective Date will be the fees of the Debtors' Professionals and the Committee's Professionals.[9] Set forth below are *estimated* fees and expenses (net of retainers) budgeted in the Cash Collateral Budget for the Debtors' Professionals and the Committees' Professionals through March 26, 2010, which is around the estimated date for the Confirmation Hearing:

| Professional | Estimated fees & expenses for period through March 26, 2010 |
|---|---|
| **Murray & Murray**<br>(Debtors' bankruptcy counsel) | $650,000 (from October 1, 2009) |
| **Latham & Watkins, LLP**<br>(Debtors' special corporate counsel) | $200,000 (from October 1, 2009) |
| **Law Offices of Matthew A. Joseph**<br>(Debtors' special intellectual property counsel) | $100,000 (from October 26, 2009) |
| **Gifford, Krass, Groh, Sprinkle, Anderson & Citkowski, P.C.**<br>(Debtors' special patent counsel) | $1,000 (from June 9, 2009) |
| **Wilson Sonsini Goodrich & Rosati P.C.**<br>(Debtors' special real estate counsel) | $100,000 (from June 9, 2009) |
| **Mohler, Nixon & Williams**<br>(Debtors' accountants) | $75,000 (from June 9, 2009) |
| **Binder & Malter LLP**<br>(Counsel for the Creditors' Committee) | $165,000 (from October 1, 2009) |
| **TOTAL:** | $1,291,000 |

---

[9]   As discussed above, the Court previously approved and allowed fees and expenses on an interim basis to Murray & Murray, Latham & Watkins LLP, the Law Offices of Matthew A. Joseph, and Binder & Malter pursuant to their respective applications.  The Debtors have paid the Court-approved amounts.  Additionally, pursuant to the Sale Order and the Needham Order, the Debtors paid Needham its fixed fee and expense reimbursement.  Where available, the below estimates include actual fees and expenses of the particular professional.

1    Additional fees and expenses will be incurred by some or all of these professionals after the

2    dates indicated.[10]  All professional fees through the Confirmation Date are subject to Court approval

3    after notice and a hearing.  In addition, the Debtors pay the fees and expenses incurred on a monthly

4    basis by Omni Management Inc., the Court-approved claims and noticing agent.  The Debtors

5    anticipate that these fees and expenses from January 1, 2010 through March 31, 2010, will

6    approximate $7,500.00.

7        In addition, the Debtors believe that certain Creditors may assert "reclamation claims" which

8    constitute Administrative Claims under Section 503(b)(9) of the Bankruptcy Code.  As indicated in

9    ATI's and Aviza's Schedules, the Debtors estimate that these Claims may aggregate to $5,400.

10       A preliminary review of filed Claims reflects an asserted Administrative Claim by Oracle in

11   the amount of $354,136 which has been satisfied in connection with the assumption and assignment

12   of its license with respect to the SPP Purchase Transaction.  A purported Administrative Claim was

13   also filed by Bayport Batavia Associates, L.P., a former landlord of the Debtors, in the amount of

14   $9,430 for rent; however, the Debtors rejected the associated property lease effective as of the

15   Petition Date, and therefore any asserted Claim is at most a general unsecured Claim.  Similarly,

16   GECC filed a purported administrative expense Claim in the amount of $70,553.  As discussed

17   above, however, pursuant to the GECC Rejection Order, the Debtors rejected their master lease

18   agreement with GECC effective as of the Petition Date, and therefore, GECC's Claim, to the extent

19   it is allowed, should be afforded general, unsecured status.  Hartford Life and Accident Insurance

20   Company filed a purported Administrative Claim in the amount of $10,639 based on insurance

21   premiums incurred during the pendency of the Bankruptcy Cases.  The Debtors believe that they

22   have paid premiums owed to Hartford Life and Accident Insurance Company as they have become

23   due, and therefore, this Claim will likely be the subject of an objection.

24       In addition to the above, the Debtors anticipate that Administrative Claims will include a

25   small amount of current expenses incurred in the ordinary course of the Debtors' operations which

26   they will not have paid by the Effective Date.  These amounts will be paid in the ordinary course of

27
28
     [10]  The Debtors anticipate that they may apply to the Court for authorization to employ special litigation counsel, specifically to manage litigation of the IPS Action.  In that instance, the fees and expenses of such special litigation counsel also would be included as an Administrative Claim.

the Debtors' business.

### 6.1.3    <u>Administrative Claims – Treatment.</u>

Estimated Administrative Claims through December 31, 2010 are included and accounted for in the Cash Collateral Budget; however, the actual Allowed Administrative Claims may be more or less than the budgeted amounts depending on the services required.  Additional Administrative Claims will be incurred on and after January 1, 2011.  Except to the extent that the holder of a particular Administrative Claim has agreed to a different treatment of such Claim, each holder of an Allowed Administrative Claim will be paid in cash, in full upon the later of (a) the Effective Date; (b) if such Claim is initially a Disputed Claim or an order of the Court is required prior to any payment, upon the ultimate allowance of such Claim by a Final Order of the Bankruptcy Court; and (c) if such Claim is incurred after the Petition Date in the ordinary course of the Debtors' business, within such time as payment is due pursuant to the terms giving rise to such Claim.

### 6.1.4    <u>Administrative Claims – Deadline for Requests for Payment.</u>

Any request for allowance of an Administrative Claim pursuant to Section 503(a) of the Bankruptcy Code, other than by the Debtors' Professionals and the Committee's Professionals, must be filed on or before the "Administrative Claims Bar Date," which is thirty (30) days following the date of the Effective Date.  If the holder of an asserted Administrative Claim does not file and serve a request for payment of such Claim (according to the procedures set forth in the Plan) on or before that date, the holder will be forever barred from asserting such Claim or receiving any payment on account of such Claim.

### 6.2    <u>Tax Claims.</u>

#### 6.2.1    <u>Description.</u>

Certain Claims by governmental units, primarily Tax Claims, are entitled to priority over pre-petition Claims of general unsecured Creditors pursuant to Section 507(a)(8) of the Bankruptcy Code.  The Debtors estimate the Allowed Tax Claims in the amount of approximately $69,000. Certain Tax Claims have been filed by various Creditors, including the Santa Cruz County Tax Collector ($153,122), the Orange County Tax Collector ($9,630), the State of New Jersey ($7,400) and the Texas Comptroller ($2,559).  As of the date of this Disclosure Statement, filed Tax Claims

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 17:25:19   Page 33 of 86

29   DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF ... (DATED JANUARY 7, 2 ...

aggregate to $175,895. However, the Debtors have paid substantially all of these Claims or otherwise resolved them, and therefore believe that the large majority will not be Allowed. Pending review of asserted Tax Claims, the amount of the Allowed Tax Claims may vary from the above estimate.

### 6.2.2    Tax Claims – Treatment.

Except to the extent that the holder of a particular Tax Claim has agreed to a different treatment of such Claim, after payment in full of (a) the Allowed Secured Claim of the Banks; (b) other Allowed Secured Claims, if any, or reservation otherwise for such Allowed Secured Claims, to the extent of the lien on the particular collateral underlying such lien; and (c) all Allowed Priority Claims, each holder of an Allowed Tax Claim will receive a cash payment equal to the Allowed Amount of such Claim plus interest on such Allowed Claim at the rate of interest determined under applicable non-bankruptcy law pursuant to Bankruptcy Code Section 511, from the Petition Date through the date of payment in full; provided, however, that (a) no such payment will be made longer than five (5) years from the Petition Date; (b) no holder of an Allowed Tax Claim shall be treated in a manner less favorable than any Allowed Claim in Class 8; and (c) with respect only to Tax Claims based on accrued real property taxes assessed against and secured by the Scotts Valley Property, such Allowed Tax Claims will not be paid until such property is sold.

### 6.3    Class 1:  Secured Claim of the Banks.

#### 6.3.1    Description (Class 1 Under the Plan).

Class 1 consists of the Secured Claim of the Banks.

#### 6.3.2    Secured Claim of the Banks – Treatment.

The Allowed Secured Claim of the Banks will be paid in cash as soon as reasonably practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim. During the pendency of these Bankruptcy Cases, the Debtors have made certain payments to the Banks on account of their Secured Claim. The calculation of the Allowed Amount of such Claim will therefore include a reduction by such amounts. The Allowed Secured Claim of the Banks will be satisfied from the liquidation of the Debtors' remaining assets and from the proceeds of the Sales Transactions; provided, however, that

th
S:\A G9\P 5461 a 1 DS\Disclosure #416TH).doc
30
DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF
(UPDATED AS OF JANUARY 7, 2010)

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 17:43:31   Page 34 of 86

any payment will be subject to the terms of the cash collateral orders entered or to be entered in the Bankruptcy Cases. If any Claim of the Banks is determined to be an Allowed Unsecured Claim, such Claim will receive the same treatment provided to other Persons holding similar Allowed Claims in Class 8.

CLASS 1 IS IMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 1 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

### 6.4 **Secured Claim of ESI**

#### 6.4.1 **Description (Class 2 Under the Plan).**

Class 2 consists of the Secured Claim of ESI to the extent such Secured Claim constitutes an Allowed Claim. This Claim is based on the mechanic's lien filed by ESI against the Scotts Valley Property which was not included in any of the Sales Transactions and remains an asset of the Debtors.

#### 6.4.2 **Secured Claim of ESI – Treatment.**

The holder of the Allowed Claim of ESI, to the extent such Allowed Claim constitutes a Secured Claim, will receive either: (a) the net proceeds from the sale of the Scotts Valley Property at the time of such sale or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim; or (b) such other less favorable treatment as shall be agreed to by the Reorganized Debtor and the holder of such Secured Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8.

CLASS 2 IS UNIMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 2 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

### 6.5 **Secured Claim of Iron Mountain**

#### 6.5.1 **Description (Class 3 Under the Plan).**

Class 3 consists of the Secured Claim of Iron Mountain to the extent such Secured Claim constitutes an Allowed Claim. This Claim is asserted in the amount of $4,743, based on the alleged warehouseman's lien asserted by Iron Mountain, in 4,743 boxes in Iron Mountain's storage facility.

The records stored at Iron Mountain remain assets of the Debtors.

### 6.5.2 Secured Claim of Iron Mountain – Treatment.

The holder of the Allowed Claim of Iron Mountain, to the extent such Allowed Claim constitutes a Secured Claim, will receive either: (a) the net proceeds from the removal, destruction or disposition otherwise of its collateral as appropriate pursuant to applicable law, at the time of such disposition or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim; or (b) such other less favorable treatment as shall be agreed to by the Reorganized Debtors and the holder of such Secured Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8.

CLASS 3 IS UNIMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 3 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

### 6.6 Other Secured Claims (other than the Banks, ESI and Iron Mountain).

### 6.6.1 Description (Class 4 Under the Plan).

Class 4 consists of any other holders of Allowed Secured Claims (each of which will be its own subclass under Class 4). As discussed above in Subsection 5.4.1, as of the Petition Date, several parties filed protective UCC-1 financing statements against the Debtors.[11] The Debtors believe that the majority of those parties no longer hold active or valid liens against the Debtors' assets. With the exception of IBM Credit, the Debtors further believe that they are not in possession of any property that may be subject to such liens. The Debtors presently are conducting investigations related to the liens asserted by IBM Credit each of which indicates they are filed for protective purposes. The equipment underlying IBM Credit's purported liens was not included in any of the Sales Transactions. IBM Credit filed a Proof of Claim asserting only general unsecured and priority administrative status based on computer leases to the Debtors.

---

[11] A Claim is a Secured Claim only to the extent of the value of the holder's interest in the Debtors' interest in the Collateral securing the Claim or the extent of the amount subject to recoupment or setoff, as applicable, as determined by the Bankruptcy Court under section 506(a), 553, and/or 1129(b)(2)(A)(ii)(II) of the Bankruptcy Code, as applicable.

To the extent that any remaining valid liens exist, the Debtors anticipate that they will contact each purported lien holder to obtain a consensual release or to resolve each matter otherwise. If appropriate, the Debtors or Reorganized Debtors may file complaints to determine the validity, priority or extent of each lien and/or to avoid each such lien. Each such complaint would represent a Retained Claim as discussed in Subsection 7.7.5 below.

The Debtors scheduled Class 4 Claims in unknown amounts. In addition, certain Proofs of Claim filed assert an aggregate of approximately $2,300 in Class 4 Claims which the Debtors dispute. All purported Class 4 Claims are subject to verification and are likely to be reduced following the Debtors' resolution of Disputed Claims.

### 6.6.2 <u>Other Secured Claims – Treatment.</u>

Each holder of an Allowed Class 4 Secured Claim, to the extent there are any such Allowed Class 4 Secured Claims, will receive on the Effective Date, at the Reorganized Debtors' option: (a) the net proceeds from the sale of its collateral at the time of such sale or as soon thereafter as practicable, up to the unpaid Allowed Amount of such Claim and with the same extent, priority and validity of the lien securing such Allowed Claim; (b) the return of its collateral; or (c) such other less favorable treatment as may be agreed to by the Reorganized Debtors and the holder of such Secured Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 8.

CLASS 4 IS UNIMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 4 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

### 6.7 <u>Employee Priority Claims.</u>

### 6.7.1 <u>Description (Classes 5 and 6 under the Plan).</u>

Certain Claims of employees incurred in the months prior to the commencement of the Bankruptcy Cases are entitled to priority under Section 507(a)(4) of the Bankruptcy Code. In addition, certain Claims based on contributions made to employee benefits plans in the months prior to the commencement of the Bankruptcy Cases are entitled to priority under Section 507(a)(5) of the Bankruptcy Code.

33   DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF ...

The Debtors' Schedules indicate that the Claims under Classes 5 and 6 aggregate to approximately $347,000 as of the Petition Date. However, pursuant to the Court's ORDER GRANTING MOTION FOR ORDER AUTHORIZING THE DEBTOR TO (I) HONOR PRE-PETITION EMPLOYEE WAGES, OBLIGATIONS AND CONTRIBUTIONS TO EMPLOYEE BENEFIT PLANS; AND (II) FOR THE DEBTOR AND BANKS AND OTHER FINANCIAL INSTITUTIONS TO COMPLY WITH PROCEDURES RELATING THERETO entered on June 22, 2009, the Court authorized the Debtors to pay outstanding pre-petition salaries, wages, and business expense and to honor vacation and honor any other outstanding employee obligations, up to a maximum of $10,950 per employee. Consequently, the Debtors have paid some Claims within Classes 5 and 6 in the amount of approximately $160,000. In addition, the Debtors believe that they previously pre-paid some of the Claims asserted based on employee benefits plans which comprise Class 6. Furthermore, pursuant to the Purchase Transaction, SPP assumed certain liabilities of employees which constitute Priority Claims within Class 5 and Class 6, which the Debtors estimate around $18,000. Accordingly, the Debtors believe that the amount of Allowed Claims in Class 5 and Class 6 will be less than the scheduled amounts.

### 6.7.2    Employee Priority Claims – Treatment.

Except to the extent that the holder of a particular Priority Claim entitled to priority under Sections 507(a) (4) and (5) of the Bankruptcy Code has agreed to a different treatment of such Claim, each holder of such Claim will receive, as soon as reasonably practicable after payment in full of (a) the Banks' Allowed Secured Claim, and (b) other Allowed Secured Claims, if any, or reservation otherwise for such Allowed Secured Claims, to the extent of the lien on the particular collateral underlying such lien, deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim plus interest calculated at the Legal Rate from the Petition Date through the date of payment in full.

CLASS 5 AND CLASS 6 ARE IMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 5 AND CLASS 6 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

/ / /

/ / /

6.8 **Top Hat Claims**

    6.8.1 **Description (Class 7 under the Plan).**

Class 7 consists of the Allowed Claims of certain employees to funds held in a trust account established by the Debtors. Prior to the Petition Date, the Debtors established the Top Hat Plan whereby the Debtors promised to pay certain employees deferred compensation at a future time. In accordance with the Plan, the Debtors set aside in a segregated trust account, deferred compensation amounts (i.e., the Top Hat Funds) which were to remain the general assets subject to the Debtors' creditors in the event of insolvency. As discussed below in Subsection 7.7.4, the Top Hat Funds still remain in their segregated trust accounts and are assets of the Bankruptcy Estates.

    6.8.2 **Top Hat Claims – Treatment.**

The holders of Allowed Class 7 Claims will retain their rights under the Top Hat Plan and treatment of such Claims shall be as afforded under the Top Hat Plan. Distributions made from the Top Hat Funds will be subject to the Reorganized Debtors' withholding and payment of applicable federal and state withholding income tax amounts to the appropriate taxing authorities (as required).

CLASS 7 IS UNIMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 7 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

6.9 **Timely-Filed Unsecured Claims.**

    6.9.1 **Description (Class 8 under the Plan).**

Class 8 consists of all Claims against the Company that were filed on a timely basis and that are not included or provided for in any other class, irrespective of when incurred. This class includes all unsecured Claims of vendors and trade Creditors for goods delivered and services provided to the Company and all Rejection Claims. Class 8 excludes unclassified and priority Administrative Claims, Tax Claims, Secured Claims, Priority Claims and Top Hat Claims. The total amount of general unsecured Claims listed in the Debtors' Schedules is approximately $9.8 million. The total amount asserted against the Debtors in Proofs of Claims filed in the Bankruptcy Cases as of December 2009, is approximately $98 million although this amount includes many Claims which are disputed by the Debtors, including the above-discussed IPS Claim in the amount of $86.5

th
C:\...\PROPS\DS\DisclosureStatement(FH).doc
Case 09-54511 Doc# 416 Filed: 01/07/10 Entered: 01/07/10 17:43:01 Page 39 of 86

35 DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF
REORGANIZATION DATED JANUARY 7, 2010

| | million.  The Debtors believe the total Class 8 Allowed Timely Filed Unsecured Claims will |
|---|---|
| 1 | |
| 2 | approximate $14.0 million. |

**6.9.2   Timely Filed Unsecured Claims – Treatment.**

After payment in full of Allowed Claims in Classes 1 through 6, and payment or reserve for the Liquidation Incentive Accruals, each holder of a Class 8 Allowed Timely Filed Unsecured Claim will receive its Pro Rata share of Available Cash, if any, pursuant to one or more Distributions until the depletion of the Available Cash or payment in full.

In addition, if the Allowed Claims in Class 9 are paid in full, then each holder of an Allowed Claim in Class 8 will receive interest on such Allowed Claim from the Petition Date through the date of payment in full to the extent of remaining Available Cash, on a Pro Rata basis with all other holders of Allowed Claims in Classes 8 and 9 (all at the applicable rate specified in the Plan for such Claims).

The Disbursing Agent will make the first Distribution on account of Allowed Claims in Class 8 as soon as reasonably practicable upon the later of: (a) payment in full to the holders of Allowed Class 6 Claims in accordance with the Plan, or (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Claim, but in no event prior to the Administrative Claims Bar Date or the Rejection Claims Bar Date.

The promissory notes received by the Debtors in connection with the Purchase Transaction do not mature until April 16, 2011.  One of the promissory notes is also a non-recourse note.  The recoveries on that note are based on the sale of inventory and the collection of certain accounts receivable.  Whether the full amount of the Sale Proceeds is realized will therefore not be known until possibly April 2011 (or later if the Debtors receive inventory and accounts receivable back at the time the notes have matured).  Therefore, the amount of Available Cash and the timing of Distributions will be influenced accordingly.

CLASS 8 IS IMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 8 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

/ / /

/ / /

6.10 **Late Filed Unsecured Claims.**

### 6.10.1  Description (Class 9 Under the Plan).

Class 9 consists of all Claims that would be entitled to treatment as a general unsecured Claim in Class 8, but for the fact such Claim was not filed by the Claims Bar Date, but does not include any Claim that is filed after the Effective Date.  Claims filed after the Effective Date will not be allowed or paid under any circumstance.  Class 9 includes, without limitation, the Claim of AT Germany and UCT.

### 6.10.2  Late Filed Unsecured Claims – Treatment.

Each holder of an Allowed Late Filed Unsecured Claim will receive its Pro Rata share of Available Cash remaining after payment in full of Allowed Claims in Class 8.

In addition, if the Allowed Claims in Class 9 are paid in full, then each holder of an Allowed Claim in Class 9 will receive interest on such Allowed Claim from the Petition Date through the date of payment in full to the extent of remaining Available Cash, on a Pro Rata basis with all other holders of Allowed Claims in Classes 8 and 9 (all at the applicable rate specified in the Plan for such Claims).

The Disbursing Agent will make the first Distribution on account of Allowed Claims in Class 9 as soon as reasonably practicable upon the later of: (a) payment to the holders of Allowed Class 8 Claims in accordance with the Plan, or (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Claim, but in no event prior to the Administrative Claims Bar Date or the Rejection Claims Bar Date.

CLASS 9 IS IMPAIRED AND THE HOLDERS OF ALLOWED CLAIMS IN CLASS 9 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

6.11 **Interests (Holders of Common Stock).**

The Debtors do not expect that there will be any Available Cash to make any Distributions to holders of Allowed Interests.  However, the Plan includes Class 10 and Class 11 to afford treatment to Interest holders in the event any Available Cash remains for Distribution on Allowed Interests.

### 6.11.1  Description (Class 10 under the Plan).

Class 10 includes all Allowed Interests of the holders of the Company's common stock;

provided, however, for purposes of Distribution under the Plan, the Allowed Interests of the holders of the Company's common stock will include, and be limited to, the holders of record on the "Record Date" (defined in the Plan and below), any transfers thereafter notwithstanding.

As discussed above, the Company's common stock previously was delisted from the Nasdaq Global Market and currently is now trading only on "pink sheets." In order to fix which holder of particular shares is entitled to receive Distributions pursuant to the Plan, the Record Date must be established such that, when fixed, only the holders of shares (Allowed Interests) on such Record Date will be entitled to receive Distributions. The "Record Date" hereunder for purposes of Distribution means the close of business on the 30th day after the Effective Date.

As of July 2009, there were approximately 21,900,000 registered shares of common stock of the Company issued and outstanding, held by approximately 190 holders of record. This number does not include beneficial holders of the common stock for whom shares are held in "nominee" or "street" accounts. As of June 2009, there were at least 2500 beneficial holders of the Company's common stock holding approximately 10,500,000 shares.

### 6.11.2  Holders of Interests (Common Stock) - Treatment.

Each holder of an Allowed Interest in Class 10 will receive, on account of, and in exchange for, its Allowed Class 10 Interest, its Pro Rata share of all Available Cash remaining, if any, after payment in full of Allowed Claims in Class 9, including interest on all Allowed Claims as provided under the Plan, and payment of or reserve for the Liquidation Incentive Supplement.

Immediately following the Record Date, the stock transfer ledgers of ATI will be closed, and there will be no further changes made or processed in the holders of record of ATI's common stock. The Company's stock transfer agent or agents will not accept or process any requests or instructions for transfers of ATI's common stock after the Record Date. The Debtors, the Reorganized Debtors, the Disbursing Agent and the Responsible Person, will not recognize any transfer of ATI's common stock after the Record Date, but will instead be entitled to recognize and deal for all purposes with only those holders of record stated on the applicable transfer ledgers as of the Record Date.

Distribution payments will also be sent only to the record holders of ATI's common stock as of the Record Date. Distributions to a beneficial owner whose shares are held in "nominee" or

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 17:35:27

"street" name will be made to the applicable broker or account representative.  The beneficial owner is responsible for assuring that its nominee transmits to them any Distribution received from the Company.

CLASS 10 IS UNIMPAIRED AND THE HOLDERS OF ALLOWED INTERESTS IN CLASS 10 ARE CONCLUSIVELY PRESUMED, PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE, TO HAVE ACCEPTED THE PLAN.

### 6.12    **Interests (Option Holders).**

#### 6.12.1  **Description (Class 11 under the Plan).**

Class 11 includes the Allowed Interests of the holders of stock options and/or other rights to acquire any equity security of the Company.[12]  As of January 16, 2010, the Debtors estimate that there will be over 1,200,000 unexpired options held by eleven holders.

#### 6.12.2  **Interests (Option Holders) – Treatment.**

For purposes of Distribution under the Plan, the Allowed Interests of the holders of the Debtors' common stock will include, and be limited to, the holders of record on the Record Date, any transfers thereafter notwithstanding.  Accordingly, after the Record Date, Interest holders of unexercised options will not receive any Distributions under the Plan.  Any unexercised options as of the Record Date will be cancelled.

CLASS 11 IS IMPAIRED AND THE HOLDERS OF ALLOWED INTERESTS IN CLASS 11 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

ARTICLE VII.

IMPLEMENTATION OF THE PLAN OF REORGANIZATION

### 7.1    **Substantive Consolidation**

Upon the Effective Date, the Bankruptcy Estates of ATI, Aviza and TTI will be deemed substantively consolidated for purposes of administration, liquidation of assets, as well as Distributions to Creditors under the Plan.

### 7.2    **Financial Information.**

The Debtors' monthly operating reports containing financial information are on file with the

---

[12] All warrants in the Company have expired.

Bankruptcy Court and will be provided to Creditors and other parties in interest upon request. The Debtors will continue to file monthly operating reports with the Bankruptcy Court through the date of Court approval of the Plan.

7.3 **Continuing Effect and Performance of Existing Orders.**

The Bankruptcy Court has entered various orders during the pendency of these cases which will remain in effect notwithstanding confirmation of the Plan, and the Reorganized Debtors will continue to carry out the matters provided for under such orders. Without limitation, these orders include the following matters.

### 7.3.1  Cash Collateral

The Court has previously entered certain orders concerning the use of cash collateral. All such orders will continue in full force and effect notwithstanding confirmation of the Plan. Among other things, the orders have authorized and continue to authorize the use of cash collateral for purposes of liquidating the Debtors' remaining assets (discussed below) pursuant to a budget approved by the Banks. As discussed above, the Cash Collateral Budget attached hereto as **Exhibit "A"** sets forth the Debtors' anticipated budget through December 2010. As set forth in the Cash Collateral Order, the Banks have also agreed to subordinate their Claims and liens to the payment of "(i) all statutory fees of the Court and the United States Trustee; (ii) the expenses of the Committee members not to exceed in the aggregate $2,500 per month; (iii) allowed fees and expenses of the Debtors' and the Committee's professionals; and (iv) the compensation and expense reimbursement (other than professional fees and expenses) of a trustee in any superseding Chapter 7 case."

### 7.3.2  Sales of Assets

The Purchase Transaction.    As discussed above, the Court previously entered orders with respect to the sale of certain of the Debtors' assets to SPP both confirming the Sale and authorizing the Debtors to assume and assign to SPP certain executory contracts. These orders will remain in full force and effect and will not be modified by the Plan. Among other things, the Sale Order authorizes the Debtors to "[f]ully assume, perform under, consummate and implement the terms of the Purchase Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement,

40   DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF

Case 09-54511  Doc# 416  Filed: 01/07/10  Entered: 01/07/10 07:43:07  Page 44 of
86

[the Sale Order] and the sale of the Purchased Assets contemplated thereby, and to take all further actions as may reasonably be requested by the Buyer (or that may otherwise be necessary or appropriate) for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Purchased Assets or Assumed Liabilities, or to carry out the terms of [the Sale Order], in each case without any further corporate action or orders of this Court." [Sale Order, at Para. 5]. Nothing in the Plan or this Disclosure Statement shall conflict with or derogate from the provisions of the Sale Order.

Low-K Patents. As discussed above, the Court's Low-K Patents Order authorized and approved the sale of certain patents to AMAT. As with the Sale Order, the Low-K Patents Order remains in full force and effect and will not be modified by the Plan. It also includes language similar to the above-referenced language in the Sale Order which authorizes the Debtors to consummate and implement the terms of the purchase agreement with AMAT. [Low-K Patents Order, at Para. 4].

Disposition of Certain Fixed Assets and Equipment. The Excess Equipment Order entered on September 30, 2009 by the Bankruptcy Court established certain protocols for the sale of certain fixed assets and equipment. Specifically, the Excess Equipment Order authorizes the Debtors, *inter alia*, to sell certain assets and equipment via private sale upon two business days' notice to counsel for the Banks and the Committee. Such assets include the Debtors' laboratory equipment, machine shop tools and other miscellaneous fixed assets (i.e., the Excess Equipment Assets). The order also authorizes the Debtors to abandon Excess Equipment Assets that are burdensome to the Bankruptcy Estates or that have inconsequential value as determined by the Debtors in the exercise of their reasonable business judgment and upon two business days' notice to counsel for the Banks and the Committee. The terms of the Excess Equipment Order will remain in effect and will govern the Reorganized Debtors' sale and disposition of Excess Equipment Assets.

7.4   **Liquidation of Remaining Assets.**

A summary of the Debtors' remaining assets is provided below in Section 7.7. The Reorganized Debtors (through the Responsible Person) will continue to liquidate remaining assets as appropriate, unless the Responsible Person determines that any asset is of inconsequential value or

that the cost of liquidating such asset would exceed the expected amount of proceeds. The Excess Equipment Order will govern the procedure for liquidation and/or abandonment of the Excess Equipment Assets. With respect to assets not subject to the Excess Equipment Order, approval of the Bankruptcy Court will not be required for the sale or other disposition of any such remaining assets; provided, however, that the Reorganized Debtors will comply with the Notice Procedure before selling the Scotts Valley Property and the ALD Product Line, and before selling or abandoning any other asset with a fair market value in excess of $5,000 which is not an Excess Equipment Asset.

The Debtors and/or the Reorganized Debtors will liquidate the Bankruptcy Estate's assets and collect and/or prosecute all of its claims, including Retained Claims, the cash proceeds of which will be added to the Available Cash and deposited into the Distribution Account. In addition, cash received from the promissory notes included in the Purchase Transaction and from the wind down of and upstreaming by direct and indirect subsidiaries to the Debtors and/or the Reorganized Debtors, will be deposited into the Distribution Account. Except as otherwise provided herein or in the Plan, all Available Cash shall be held in trust by the Reorganized Debtor or the Disbursing Agent, as applicable, in the Distribution Account and is deemed held in trust for the holders of Allowed Claims and Allowed Interests entitled to Distributions under the Plan and will not be deemed for any purpose as personal assets of any Disbursing Agent. Any Disbursing Agent will keep all such property segregated from any other property possessed or administered by it. The costs of liquidation will be paid in accordance with the Cash Collateral Budget. At the end of each month, the Reorganized Debtors will report any variance between the Cash Collateral Budget for that month in terms of receipts and expenditures. If expenses are greater than the budgeted amounts for a particular month, the Banks will receive less than the amount budgeted for that month. If the net amount received for a particular month exceeds the amount estimated in the budget, the excess funds will be payable to the Banks and/or to holders of Allowed Administrative Claims and Allowed Priority Claims as provided by the Plan. Once these Allowed Claims are paid in full, the Reorganized Debtors will commence Distributions to other creditors pursuant to the priorities established by the Bankruptcy Code as provided by the Plan.

Case 09-54511   Doc# 416   Filed: 01/07/10    Entered: 01/07/10 07:39:03   Page 46 of 86

7.5    **Liquidation Incentive Program.**

In an effort to maximize efficiency during the Debtors' liquidation of assets, the Plan implements the Liquidation Incentive Program which provides for deferred compensation to certain employees of the Reorganized Debtors to act in the place of a liquidating agent on behalf of the Reorganized Debtors. Due to the complex and technical nature of the Company's operations and products, in addition to its extensive geographical reach and customer base, the employees of the Reorganized Debtors are in the optimal position to market and liquidate the Company's remaining assets (discussed in greater detail below in Section 7.7). Prior to the Petition Date, the Debtors had established a similar program which provides for 5% commission on sales of certain assets and which still remains in place. The Liquidation Incentive Program proposes an increase in the amounts of commission based on the remaining assets to be liquidated as specified by the program. The current program (providing for 5% commission) will remain in place until superseded by the Liquidation Incentive Program. The Debtors believe that the Liquidation Incentive Program will encourage existing employees to remain with the Company to assist with the liquidation of its assets, notwithstanding its imminent closure. The alternative - an outside, third-party liquidator - likely would produce far less desirable returns at a higher cost to the Estates (estimated at a 20% commission for all sales).

The Liquidation Incentive Program will be calculated based on the Liquidation Incentive Accruals which are comprised of a percentage of the proceeds of the sales of the Debtors' assets, as follows:

a.    10% of the proceeds from the sale of the ALD Product Line;

b.    10% of the proceeds from the sale of Excess Equipment Assets;

c.    12% of the proceeds from the sale of Obsolete Inventory (which includes, for example, unused or excess inventory as well as certain demonstration equipment);

d.    15% of the proceeds from the sale of miscellaneous expensed items (which include, for example, expensed materials, tools and supplies); and

e.    20% of the actual monthly amount in expenditures which is less than the amount allocated for each respective month for the Debtors' domestic operations in the Cash Collateral

Budget (i.e., the difference between actual expenditures and allocated expenditures set forth in the Cash Collateral Budget, calculated on a monthly basis), but excluding the fees of the Debtors' Professionals, the fees of the Committee's Professionals, costs charged by the Bankruptcy Court related to the Cases, costs incurred for mailings in the Cases, and administrative fees charged by the Banks.

The Liquidation Incentive Program will commence on the Effective Date and apply to all transactions described above that occur following the Effective Date. The proceeds of the Liquidation Incentive Program will be calculated upon the occurrence of any of the above transactions, and will be accrued as a post-Confirmation obligation of the Reorganized Debtors. No payments will be made to eligible employees until all Allowed Secured Claims, Priority Claims and Tax Claims (other than real property taxes secured by the Scotts Valley Property which will be paid upon the sale of such property) are paid (or reserved for) in full. At such time as all Allowed Secured Claims, Priority Claims and Tax Claims (other than real property taxes secured by the Scotts Valley Property) have been paid or reserved for, the amount of the Liquidation Incentive Accruals will be immediately payable, subject to the procedure described in the last paragraph in this Section 7.5 herein. The Liquidation Incentive Accruals will be allocated as determined by the Reorganized Debtors (and approved by the Responsible Individual) based in proportion on the salary of each participating employee as well as the participating employee's level of involvement (e.g., performance, responsibility and time committed). Eligibility to participate in the Liquidation Incentive Program shall be determined by Reorganized Debtors (and approved by the Responsible Person).

In addition, at such time as all Allowed Claims of Creditors have been paid in full (with interest) or reserved for, the amount of the Liquidation Incentive Supplement (defined in the Plan as 15% of any remaining Available Cash after payment in full with interest on, or reservation for, all Allowed Claims of Creditors) shall be immediately payable, subject to the procedure described in the following paragraph. The Liquidation Incentive Supplement will be allocated as determined by the Reorganized Debtors (and approved by the Responsible Individual) based in proportion on the salary of each participating employee as well as the participating employee's level of involvement

(e.g., performance, responsibility and time committed). Eligibility to participate in a Liquidation Incentive Supplement shall be determined by Reorganized Debtors (and approved by the Responsible Person).

Prior to making any payments pursuant to the Liquidation Incentive Program, the Reorganized Debtors will serve written notice to the Notice Parties of the proposed payments, including an accounting of the amounts to be paid (i.e., a summary of particular sales or budget savings and the associated percentage applied pursuant to the Liquidation Incentive Program). The Reorganized Debtors will be authorized to make all such proposed payments fifteen (15) days after service of such notice unless, before the expiration of such fifteen (15)-day period, any Notice Party has filed an objection to such proposed payments with the Bankruptcy Court and scheduled a hearing on such objection within thirty (30) days after the filing of such objection, with proper notice to the Reorganized Debtors. If any such objection is filed, the Reorganized Debtors will not make payment of any amount in dispute pursuant to the Liquidation Incentive Program unless the Bankruptcy Court enters an order approving such payment or the objection is withdrawn.

## 7.6 **Wind Down of Subsidiaries.**

Upon performance of their obligations in connection with the Purchase Transaction, the Debtors intend to wind down and close their subsidiaries with any funds remaining after satisfaction of the claims, taxes and closure costs of same to be upstreamed to the Reorganized Debtors. The Plan provides that the Reorganized Debtors, through the Responsible Person, will have full authority to take any action as may be reasonably necessary to carry out or implement wind down of the Debtors' subsidiaries.

## 7.7 **The Debtors' Remaining Assets.**

### 7.7.1 **Cash.**

As of November 27, 2009, the Debtors had cash on hand of approximately $3.1 million. As discussed above, the use of cash is subject to the Cash Collateral Budget until such time as the Banks Allowed Secured Claim is paid in full.

### 7.7.2 **Collection on Promissory Notes.**

As set forth above, the Debtors were issued a secured recourse and a secured non-recourse

promissory note in connection with the Purchase Transaction. The recourse promissory note has an aggregate principal amount of $10.0 million, bears interest at the prime rate, and matures on April 16, 2011. It is secured by the purchased accounts receivable and inventory and certain purchased intellectual property included in the Purchase Transaction, and it is subject to mandatory monthly prepayments of principal to the extent that SPP's collection of accounts receivable and sales of inventory securing the note, subject to certain adjustments, exceeds $10.0 million. In addition, it is guaranteed by SPP.

The non-recourse promissory note will be payable upon the sale of inventory and collection of accounts receivable that are identified as part of the Purchased Assets. It had an initial aggregate principal amount of approximately $28.7 million, based upon the purchased inventory and accounts receivable value, does not bear interest, and matures on April 16, 2011. It is secured by the purchased accounts receivable and inventory, is subject to mandatory monthly prepayments of principal to the extent that SPP's collection of accounts receivable and sales of inventory securing the note, as adjusted, exceeds $20.0 million. The non-recourse promissory note, which does not include a guaranty, provides that on its maturity date, SPP will have the option to either repay the outstanding principal amount of the non-recourse note in full or to return any remaining, uncollected accounts receivable and unsold inventory to the Debtors and/or the Reorganized Debtors. The non-recourse promissory note will be payable upon the sale of inventory and collection of accounts receivable that are identified as part of the Purchased Assets.

### 7.7.3   Real Estate.

The Debtors have a 100% fee simple interest in the Scotts Valley Property and the manufacturing facilities thereon. In 1990, the property was designated a Superfund site by the Environmental Protection Agency (the "EPA"), which made a determination that the responsible party (the "Responsible Party") for the remediation of the property was a certain previous owner. The Debtors' preliminary internal clean-up of the property to bring it into compliance has concluded, and a third-party will commence remediation of the property in early 2010. The Cash Collateral Budget allocates amounts for the Debtors' costs incurred in connection with issues pertaining to the remediation of the property. The Debtors intend to continue to cooperate with the EPA and the

Responsible Party to the extent necessary, to further the Responsible Party's efforts to fully
remediate the property and remove the Superfund designation.

To the extent the Debtors incur any costs or damages in relation to the remediation of the
Scotts Valley Property which the Debtors determine are the responsibility of the Responsible Party,
any claim based upon such responsibility, including any claims for indemnification, will constitute a
Retained Claim against the responsible previous owner(s).

Meanwhile, the Debtors have continued to market the Scotts Valley Property for sale. As of
the date of this Disclosure Statement, the property is listed at $7.5 million. The Debtors have
received an offer to purchase the Scotts Valley Property and have produced a counter-offer. The
property is being marketed by the Debtors' real estate broker, Matthew Shelton, dba J.R. Parrish-
Santa Cruz, whose terms and conditions of employment were approved by the Court on July 17,
2009.

### 7.7.4   **Top Hat Funds.**

As discussed above, prior to the Petition Date, the Debtors established the Top Hat Plan
whereby the Debtors promised to pay certain employees deferred compensation at a future time. In
accordance with the Top Hat Plan, compensation otherwise payable to participating employees was
deposited into a trust established by the Top Hat Plan. Generally, pursuant to certain deferred
compensation plans such as the Top Hat Plan, participating employees benefit from deferring
compensation to a future date and therefore are not taxed on such compensation when first earned.
Such plans provide that the funds remain general assets of the sponsoring company and upon a
company's insolvency, such funds are available to satisfy the claims of creditors. Thus, in the event
of a company's insolvency, employees with funds in the account are treated the same as general
unsecured creditors and receive Pro Rata payment along with other general unsecured creditors.[13]

---

[13] Section 3.2 of the Top Hat Plan, titled "Cessation of Benefit Payments" provides, *inter alia*, as follows:
If at any time Trustee has determined that one of the Participating Employers has become Insolvent, the Trustee
shall discontinue payments from the Trust . . . to the extent such employees' benefits correspond to assets of the Trust
contributed by such participating Employer. Further, the Trustee shall segregate the assets of the Trust attributable to
such Participating Employer's participants (the "Affected Assets") and continue to hold the Affected Assets in trust for
the benefit of the Participating Employers general creditors until the Trustee receives a court order directing the
disposition of such assets. Nothing in this Trust Agreement shall in any way diminish any rights of Plan participants or
their beneficiaries to pursue their rights as general creditors of the Participating Employer with respect to benefits due
under the Plan or otherwise. Trustee shall resume the payment of benefits to or on behalf of Plan participants who are or

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 07:43:04   Page 51 of
86

In the instant case, employees ceased deferring compensation into the Top Hat Plan in or about December 2008. Employees terminated before the within Cases were commenced were paid their deferred compensation in accordance with the terms of the Top Hat Plan. As of the Petition Date, four employees remained invested in the Plan, with the largest holder being the responsible person and CEO, Patrick O' Connor. As of the Petition Date, approximately $244,444 of the Top Hat Funds still remain in their segregated trust accounts.

Notwithstanding whether the Company was insolvent at any time, the Plan provides that the remaining employees will retain their rights under the Plan and the Top Hat Funds will be payable to those employees who deferred compensation into the Top Hat Plan which have not yet been paid. While the Debtors expect, based on current estimates, that Creditors in Class 8 will be paid in full, there can be no certainty that the Debtors' considerations at this time will be accurate as discussed in Article IX below. Accordingly, the treatment of Top Hat Claims in the Plan could allow the holders of the Top Hat Claims to receive more than general unsecured Creditors in Class 8. That is, if general unsecured Creditors receive less than 100% payment, the holders of the Top Hat Claims, by retaining their rights under the Top Hat Plan, may receive more of their Allowed Claim by retaining their rights under the Top Hat Plan. The cost of administering the Top Hat Plan will be borne by those with funds in the plan, and therefore the actual amount to be distributed to each holder of an Allowed Top Hat Claim is currently unknown.

### 7.7.5    Retained Claims.

Retained Claims are defined in the Plan, and include, without limitation, (a) all claims against current or former insiders, officers, directors and employees of the Debtors; (b) all claims against Creditors of the Debtors or counterparties to executory contracts with the Debtors; (c) all claims against all Persons whose alleged liens attached to the proceeds of any of the Sales Transactions or other sale of assets; (d) Avoidance Actions defined in the Plan to mean causes of action of the Debtors under Chapter 5 of the Bankruptcy Code; (e) all claims for indemnification or other damages related to the clean-up of the Scotts Valley Property; and (f) the specific Retained

---

were employees of such Participating Employer in accordance with Article II of this Trust Agreement on the date [that]... Trustee has determined that the Participating Employer is not Insolvent (or is no longer Insolvent) . . .

Case 09-54511  Doc# 416  Filed: 01/07/10  Entered: 01/07/10 17:43:07  Page 52 of
86

Claims discussed below in Subsection 8.1.2.

Except as provided by this Subsection 7.7.5, the Reorganized Debtors will collect and prosecute all of the Retained Claims. The Responsible Person may consult with the Creditors' Committee with respect to the prosecution of (or decision not to prosecute) Retained Claims on behalf of the Reorganized Debtors. Should the Responsible Person decide not to prosecute a particular Retained Claim, the Creditors' Committee may prosecute such matter on behalf of the Reorganized Debtors.

The Creditors' Committee will be appointed as representative of the Estates pursuant to Section 1123 of the Bankruptcy Code with respect to the prosecution and liquidation of any Retained Claim against current or former insiders of the Debtors, if any. The terms of employment of any professional retained by the Creditors' Committee relative to Retained Claims will be subject to the Notice Procedure.

Approval of the Bankruptcy Court will not be required for the settlement or other resolution of any Retained Claims; provided that the Reorganized Debtors are to comply with the Notice Procedure before settling or resolving any Retained Claim where the amount at issue exceeds $10,000.

### 7.7.6    Other Personal Property Assets.

The Debtors' primary remaining personal property assets available for liquidation are described as follows:

ALD Product Line.    The ALD Product Line is the Debtors' primary remaining intellectual property asset and includes all patents, technology and inventory related to the Debtors' atomic layer deposition technology.

Excess Equipment Assets.    This category includes the Debtors' laboratory equipment, testing equipment, machine shop tools and other tangible fixed assets. The sale of Excess Equipment Assets is governed by the Excess Equipment Order.

Miscellaneous Supplies.    This category includes the Debtors' materials, supplies and other miscellaneous, expensed assets.

Obsolete Inventory Assets.    This category includes inventory such as the Debtors' unused

or excess inventory as well as certain demonstration equipment, sold through the normal course of the Debtors' business.

### 7.8 Other Assets.

All other remaining assets of the Debtors will be liquidated or, to the extent of inconsequential value, abandoned as discussed at Section 7.4 above, which may include but are not limited to the following: (a) all rights under all contracts that have not been assumed and assigned to the Purchaser; (b) all cash, cash equivalents and cash reserves; (c) all rights to proceeds under any director and officer liability insurance policies of the Debtors; (d) all assets maintained pursuant to or in connection with any employee benefit plan (excluding the Top Hat Plan which is provided for in Class 7 of the Plan); (e) any Equity Securities of any other issuer owned by the Debtors and any notes receivable issued by any shareholder of the Company in connection with the exercise of the Company's stock options; (f) cash and proceeds received by the Debtors; (g) any and all rights under the Purchase Agreement; (h) outdated inventory that the Reorganized Debtors may sell in the ordinary course of their business; and (i) additional assets excluded from the Purchase Transaction as may be set forth more fully at Section 2.2 and in Schedule 2.2(j) of the Purchase Agreement.

### 7.9 Distributions.

#### 7.9.1 Segregated Account.

If the Disbursing Agent is a Person other than the Reorganized Debtors (see Section 7.12 below), the Disbursing Agent shall hold any funds transmitted to it in a segregated interest bearing trust account for the benefit of holders of Allowed Claims.

#### 7.9.2 Timing.

The Disbursing Agent shall make a first Distribution to holders of Allowed Claims as soon as reasonably practicable after the Effective Date as provided for in the Plan. Thereafter, the Disbursing Agent shall make one or more subsequent Distributions in its discretion, or as ordered by the Bankruptcy Court upon motion after notice provided in accordance with the Notice Procedure. Timing is as specified in the specific Classes as provided by Article VI herein. There will be no Distribution to the holder of Class 10 Interests until all Allowed Claims of Creditors are paid in full (with interest at the applicable rate as provided by the Plan) or appropriately reserved for otherwise,

as provided by the Plan.

As discussed above, due to the nature of the Purchased Assets included in the Purchase Transaction, the full value of the Sale Proceeds are contingent upon various factors, including, *inter alia*, certain promissory notes, the value of which will not be realized for at least 18 months from the Purchase Transaction and the wind down of the Debtors' subsidiaries which the Debtors estimate may require over two (2) years. The timing of Distributions to holders of Allowed Claims will be affected accordingly.

### 7.10 **Responsible Person.**

As set forth above, Patrick C. O'Connor was appointed as the Responsible Person for the Debtors. Mr. O'Connor shall remain the Responsible Person to administer the Plan and shall manage the Reorganized Debtors and have all of the authority to act on behalf of the Reorganized Debtors as if the Responsible Person was the sole officer and director of the Reorganized Debtors. Such management shall include: (a) fulfilling the duties and obligations of the Reorganized Debtors under the Plan; (b) fully administering the Bankruptcy Estates as required by the Plan, the Order of Confirmation, the Bankruptcy Code and the Bankruptcy Rules; and (c) taking such further action as may be reasonably necessary to carry out or implement the terms of the Plan. Without limiting the foregoing, the Responsible Person, acting on behalf of the Reorganized Debtors, will have all of the rights and powers of an estate representative appointed pursuant to Section 1123(b)(3) of the Bankruptcy Code to prosecute or otherwise assert the Retained Claims, including any Avoidance Actions.

The Responsible Person may resign at any time, or may be removed for cause upon motion by any party in interest to the Bankruptcy Court. In the event the Responsible Person is so removed, or in the event the Responsible Person voluntarily resigns, a new Responsible Person will be appointed by the Bankruptcy Court upon nomination by the existing Responsible Person, following notice provided in accordance with the Notice Procedure. If replaced as the Responsible Person, such Person shall turnover all of his or her books and records to the new Responsible Person.

The Responsible Person may, in his or her discretion and pursuant to the Notice Procedure, employ such other persons as may be necessary to assist him or her in this Case.

As the Responsible Person, Mr. O'Connor will be compensated at the same salaried rate as is his pre-petition salaried rate although actual compensation will be pro-rated for the amount of time actually worked by Mr. O'Connor. Mr. O'Connor will also receive the compensation earned pursuant to the Liquidation Incentive Program. Any proposed addition to or increase in Mr. O'Connor's compensation following the Effective Date will be subject to approval as provided at Section 7.11 below. Additional terms of employment of the Responsible Person will be set forth in the Order of Confirmation or a subsequent order of the Bankruptcy Court. The compensation payable to any successor Responsible Person shall be determined by the Bankruptcy Court pursuant to the Notice Procedure. Unless ordered by the Bankruptcy Court, the Responsible Person shall serve without a guaranty or fiduciary bond.

### 7.11 **Other Employees**

Presently, the Debtors have a staff of about 14 people consisting of four (4) in Accounting/Finance, five (5) in Facilities, two (2) in Administration, two (2) in Payables/Claims, and one (1) in Asset Sales, which will continue through February 2010. The Debtors anticipate the gradual reduction of their staff will be as follows: February 2010 (-1 employee), April 2010 (-2), May 2010 (-1), August 2010 (-3), September 2010 (-1), October 2010 (-2), November 2010 (-1) and December 2010 (-1).

The Debtors' payroll is forecasted every two weeks (with three pay periods in January and July 2010). Pursuant to the Plan, compensation will be made to all employees at their regular, pre-petition salary rates, although actual payroll will be pro-rated for the amount of time actually worked by each employee. Employees will continue to receive the same employee benefits received pre-Confirmation. Eligible employees will also receive the compensation earned pursuant to the Liquidation Incentive Program. Any proposed addition to or increase in any employee's compensation, other than as provided by the Plan, shall be subject to approval of the Banks (until the Allowed Banks' Claim is paid in full) and the Creditors' Committee (until Allowed Claims of the Creditors are paid in full) and in the absence of such approval, order of the Bankruptcy Court following notice provided in accordance with the Notice Procedure.

/ / /

7.12 **Disbursing Agent.**

No later than two weeks prior to the Confirmation Hearing, the Debtors may propose a Person other than the Reorganized Debtors to serve as Disbursing Agent. Employment of such Disbursing Agent will be on such terms as are set forth in the Order of Confirmation or a subsequent order of the Bankruptcy Court entered not less than fifteen (15) days after filing and service on the Notice Parties of an application for approval of such terms, pursuant to the Notice Procedure. In the event that the Debtors do not propose any Person to serve as Disbursing Agent, the Responsible Person will serve as the Disbursing Agent. Unless ordered by the Bankruptcy Court, the Disbursing Agent shall serve without a guaranty or fiduciary bond.

7.13 **Tax Returns and Payments.**

The Reorganized Debtors shall file or cause to be filed any and all delinquent and final tax returns and pay any and all taxes owed by the Debtors and the Reorganized Debtors on a timely basis (other than Tax Claims which are to be paid pursuant to the Plan).

7.14 **Exemption From Certain Transfer Taxes.**

Following Confirmation, any sales or transfers will be, to the fullest extent permitted by law, entitled to the exemptions provided for under and to the fullest extent permitted by Section 1146(a) of the Bankruptcy Code. The Debtors reserve all rights to request a determination of legal questions related to the tax effects of the Plan as appropriate under Section 1146(b) of the Bankruptcy Code.

7.15 **Termination of Employee Benefit Plans.**

Unless provided otherwise in the Purchase Agreement or by order of the Bankruptcy Court, the Reorganized Debtors will continue to fulfill all responsibilities relative to the termination of their employee benefit plans at such time as all employees are terminated, and the distributions therefrom, and will pay the costs related thereto; provided, however, that the costs of administering the Top Hat Plan will be borne by the Top Hat Funds.

7.16 **Cancellation of Legal Entities.**

At the Responsible Person's option, the Reorganized Debtors will be dissolved and its corporate existence terminated, without further corporate action, upon the entry of a Final Decree in the Bankruptcy Cases pursuant to Bankruptcy Rule 3022, as appropriate in accordance with the

provisions of the Delaware General Corporation Law. The Order of Confirmation will be deemed the appropriate authorization required under the Delaware General Corporation Law, authorizing the Responsible Person to file the requisite certificate of dissolution and certificate of cancellation with the Delaware Secretary of State together with any other filings that may be necessary to cancel and dissolve the Reorganized Debtors. Notwithstanding the foregoing, the Responsible Person may seek an order from the Bankruptcy Court for relief other than the relief set forth in this Section, for good cause shown.

### 7.17 **Further Orders.**

Upon motion by the Debtors and/or Reorganized Debtors, on not less than fifteen (15) days' notice to the Notice Parties or such shorter notice as the Court may order for cause, the Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to facilitate consummation of the Plan.

### 7.18 **Post-Confirmation Employment of Personnel.**

The Reorganized Debtors and any Disbursing Agent may employ or contract with Persons and other entities to perform, or advise and assist in the performance of, their respective obligations under the Plan. The Reorganized Debtors may continue to employ the Debtors' Professionals for the purposes for which they were employed before the Confirmation Date and for such additional purposes as the Responsible Person may request. The Reorganized Debtors, pursuant to the Notice Procedure, may also employ other professionals as necessary to perform their responsibilities under the Plan. The Creditors' Committee may continue to employ its Professionals approved by the Bankruptcy Court for their post-Confirmation services through the date the Creditors' Committee is dissolved.

### 7.19 **Post-Confirmation Compensation and Reimbursement of Professionals.**

All professionals employed by the Reorganized Debtors or the Creditors' Committee after the Confirmation Date shall be entitled to payment of their reasonable post-Confirmation Date fees and reimbursement of expenses on a monthly basis, subject to the following:

a.    Each party requesting payment of such compensation shall serve a detailed statement of requested fees and expenses on the Notice Parties;

b. Any Notice Party or other party in interest may object to any portion of the requested fees and expenses. Any objection to the payment of fees or reimbursement of expenses shall be in writing (and sufficiently detailed to allow the party whose compensation is subject to the objection an opportunity to respond, and ultimately to allow the Bankruptcy Court to rule on such objection) and served on the Notice Parties and the party whose compensation is subject to the objection. Such an objection must be served within fifteen (15) days after service of the detailed statement;

c. If there is no objection to a party's requested fees and expenses within such fifteen (15) day period, the Reorganized Debtors shall promptly pay the requested amount in full. If an objection to a portion of the fees or expenses requested is timely served, the Reorganized Debtors shall promptly pay the undisputed portion of such fees and expenses;

d. To the extent that an objection is timely served, the Responsible Person shall reserve monies in the amount of the disputed fees and expenses pending resolution of said objection;

e. Any objection to a request shall be resolved by either: (a) written agreement between the party requesting such fees and expenses and the objecting party, or (b) resolution of the disputed amount by the Bankruptcy Court. Resolution by the Bankruptcy Court shall be requested by motion filed and served on the Notice Parties in accordance with the Bankruptcy Rules and the Local Rules on not less than twenty-one (21) days notice and such motion may be filed by either the requesting party or the objecting party. Any opposition to the motion shall be filed and served no later than seven (7) days prior to the hearing; and

f. Professionals shall not otherwise be required to file applications for Bankruptcy Court approval of post-Confirmation fees and expenses.

7.20 **Creditors' Committee.**

The Creditors' Committee will continue to serve and function following the Confirmation Date, with all of the duties, obligations, defenses and immunities provided under all applicable provisions of the Bankruptcy Code relating to committees in cases under chapter 11 of the Bankruptcy Code, including all of the rights and powers set forth in Sections 1102 and 1103 of the Bankruptcy Code, until the final Distribution to Creditors upon which the Creditors' Committee shall be dissolved. If any member of the Creditors' Committee resigns from the Creditors'

Case 09-54511 Doc# 416 Filed: 01/07/10 Entered: 01/07/10 07:30:11 Page 59 of 86

Committee after the Effective Date, no new Person shall be appointed thereto; provided, however, that the remaining members of the Creditors' Committee may, in their discretion, appoint a Person to replace any member that has resigned.

        7.21    **Post-Confirmation Notice.**

        **7.21.1  Notice Generally.**

      To the extent any action taken in the Bankruptcy Cases after the Effective Date requires notice under the Bankruptcy Code or the Bankruptcy Rules, the Order Limiting Notice entered in the Bankruptcy Cases shall continue in effect, and where applicable in accordance with the Plan, notice shall be required to the Notice Parties pursuant to the Notice Procedure; provided, however, that notice shall not be required to any Person whose Claim has been paid in full.

        **7.21.2  Notice Procedure.**

      Whenever the Plan requires compliance with the Notice Procedure, the Person seeking the particular relief (the "Moving Party") will be required to serve a written notice on the Notice Parties (each, a "Notice Recipient") of the proposed action. The Moving Party will be authorized to take any action proposed to be taken in such notice fifteen (15) days after service of such notice unless before the expiration of such fifteen (15)-day period a Notice Recipient has filed an objection to such proposed action with the Bankruptcy Court and scheduled a hearing on such objection within thirty (30) days after the filing of such objection and upon not less than twenty-one (21) days notice to all Notice Parties. If any such objection is filed, the Moving Party may not take the proposed action unless the Bankruptcy Court approves such action or the objecting party withdraws the objection.

        7.22    **Post-Confirmation Reports, Fees and Final Decree.**

        **7.22.1  U.S. Trustee Fees.**

      Not later than thirty (30) days after the end of each calendar quarter that ends after the Effective Date (including any fraction thereof), the Reorganized Debtors shall pay to the United States Trustee the quarterly fee for such quarter until these Cases are converted, dismissed or closed pursuant to a Final Decree, as required by 28 U.S.C. § 1930(a)(6).

        **7.22.2  Post-Confirmation Reports.**

      Not later than thirty (30) days after the end of each calendar quarter which ends after the

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 07:43:09   Page 60 of 86

Effective Date, the Reorganized Debtors shall file and serve upon the United States Trustee a quarterly post-Confirmation status report in substantially the form provided by the United States Trustee. Further reports shall be filed thirty (30) days after the end of every calendar quarter thereafter until entry of a Final Decree, unless otherwise ordered by the Bankruptcy Court.

### 7.22.3 Final Decree.

After the Bankruptcy Estates are fully administered, the Reorganized Debtors shall file, and serve on the Notice Parties, an application for entry of the Final Decree.

### 7.23 Proofs of Claim; Objections to Claims.

### 7.23.1 Time for Filing Proofs of Claim.

Proofs of Claim, when required, must be filed with the Bankruptcy Court no later than the applicable Claims Bar Date (which for most pre-petition Claims is October 13, 2009 and for governmental units is December 6, 2009). Pursuant to the ORDER GRANTING EX PARTE MOTION FOR ORDER EXTENDING TIME TO FILE CERTAIN CLAIMS entered on November 6, 2009, the Claims Bar Date was extended to January 11, 2010 for certain pre-petition Claims which were amended in the Debtors' Schedules after the commencement of the Bankruptcy Cases.

However, Bankruptcy Rule 3001(b) provides that it is not necessary for a Creditor to file a Proof of Claim if its Claim has been listed in the Debtors' Schedules filed with the Bankruptcy Court pursuant to Section 521(a)(1) of the Bankruptcy Code and Rule 1007(a)(3) of the Bankruptcy Rules, and is not listed as disputed, contingent, unliquidated or unknown as to amount.

Equity Security Holders are not required to file any Proof of Interest because the Plan affords treatment to Equity Security Holders of record as of the Record Date. For purposes of any Distribution under the Plan, the Reorganized Debtors and its professionals, the Disbursing Agent, and the Responsible Person will have no obligation to recognize any transfer of Interests after the Record Date.

### 7.23.2 Ownership and Transfers of Claims.

The Reorganized Debtors and its professionals, the Disbursing Agent, if any, and the Responsible Person will be entitled to recognize and deal for all purposes with only those Creditors of record with the Bankruptcy Court as of the first Distribution Date. For purposes of any

Distribution under the Plan, the Reorganized Debtors and its professionals, the Disbursing Agent, and the Responsible Person will have no obligation to recognize any transfer of Claims after the first Distribution Date.

The Reorganized Debtors and its professionals, the Disbursing Agent, and the Responsible Person shall be entitled to recognize and deal for all purposes with only those Equity Security Holders of record as of the Record Date. For purposes of any Distribution under the Plan, the Reorganized Debtors and its professionals, the Disbursing Agent, and the Responsible Person will have no obligation to recognize any transfer of Interests after the Record Date.

**ANY PARTY WHO ACQUIRES A CLAIM AGAINST THE REORGANIZED DEBTORS AFTER THE FIRST DISTRIBUTION DATE MUST ARRANGE WITH THE HOLDER ON THAT DATE TO RECEIVE DISTRIBUTIONS TO WHICH THE TRANSFEREE MAY BE ENTITLED. NEITHER THE REORGANIZED DEBTORS NOR THE DISBURSING AGENT WILL BE REQUIRED TO TRACK CHANGES IN OWNERSHIP OF CLAIMS AFTER THE FIRST DISTRIBUTION DATE.**

### 7.23.3 <u>Amendments to Claims.</u>

Except as provided by the Plan or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law, Proofs of Claim: (a) may not be filed upon expiration of the applicable bar date; and (b) may not be amended later than thirty (30) days following the date of the notice of the Confirmation Date except for amendments to Proofs of Claim to decrease the amount or priority thereof; provided that the foregoing deadline shall not accord a Claim holder a right to amend a Claim that, pursuant to applicable law, is not subject to amendment.

### 7.23.4 <u>Time for Filing Objections.</u>

An objection to a Claim shall be filed no later than the Claims Objection Date which is the date two (2) years after the Effective Date; provided, however, that the Claims Objection Date may be extended by the Bankruptcy Court for cause upon the ex parte motion of the Reorganized Debtors. An objection to an Administrative Claim shall be filed no later than the Administrative Claims Bar Date which is the date ninety (90) days after the Effective Date.

/ / /

### 7.23.5  <u>Who May File Objections to Claims</u>

Any party in interest may file an objection to a Claim or Administrative Claim.  The Reorganized Debtors shall review all Proofs of Claim filed against the Debtors, shall file objections as appropriate, and shall resolve all Disputed Claims; provided, however, that the Creditors' Committee shall review all Proofs of Claims filed by the Debtors' employees against the Debtors and shall file objections thereto as appropriate.

### 7.24  <u>Disputed Claims</u>

Subject to the next sentence, any cash that would be distributed to the holder of a Disputed Claim if it were an Allowed Claim on any Distribution Date hereunder shall be set aside by the Disbursing Agent into the Disputed Claims Reserve Account.  Not later than fifteen (15) days after the Disbursing Agent has notice that a Disputed Claim has been Allowed in whole or in part, the Disbursing Agent shall Distribute the cash deposited into the Disputed Claims Reserve Account on account of such Disputed Claim.  To the extent that cash payments made into the Disputed Claims Reserve Account on account of a Disputed Claim exceed the cash distributable with respect to the Allowed Amount of such Claim, such excess cash shall be considered Available Cash.

### 7.25  <u>Distributions.</u>

Notwithstanding any provision of the Plan specifying a date or time for payments or Distributions of consideration hereunder, payments and Distributions in respect of any Claim or Interest that at such date or time is disputed, unliquidated or contingent, shall not be made until a Final Order with respect to an objection, estimation or valuation of such Claim or Interest is entered by the Bankruptcy Court, whereupon appropriate Distributions shall be made promptly in accordance with the preceding Section.

### 7.26  <u>Executory Contracts and Unexpired Leases.</u>

### 7.26.1  <u>Treatment of Executory Contracts and Unexpired Leases.</u>

The Debtors reserve the right to move the Bankruptcy Court prior to Confirmation for authority to assume, assume and assign, or reject, pursuant to Bankruptcy Code Section 365, any and all contracts that are executory and leases that are unexpired.

/ / /

### 7.26.2 **Assumption of Executory Contracts and Unexpired Leases.**

Most executory contracts and unexpired leases have already been – or will be - addressed in the Bankruptcy Cases by: (a) the Debtors' prior motion to assume and assign such contracts and leases to the Purchaser; (b) a motion by the Debtors prior to Confirmation, to assume or reject certain executory contracts or unexpired leases; or (c) the Debtors' intended rejection of remaining executory contracts and leases pursuant to the Plan as set forth in Subsection 7.26.7 below.

### 7.26.3 **Effect of Assumption.**

All executory contracts and unexpired leases assumed prior to Confirmation or pursuant to the Plan, if any, and not otherwise rejected pursuant to the Plan shall remain in full force and effect, be unimpaired by the Plan except as specifically modified by the Plan and the Order of Confirmation, and be binding on the parties thereto.

### 7.26.4 **Adding and Removing.**

The provisions of this Section 7.26 may be amended, with appropriate notice to those parties in interest directly affected, at any time prior to the conclusion of the hearing on Confirmation of the Plan, to add or remove executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected pursuant to the Plan.

### 7.26.5 **Defaults.**

Unless other treatment is agreed to between the parties to each assumed contract or lease, or unless otherwise set forth in the Purchase Agreement, if there has been a default in an assumed executory contract or unexpired lease other than the kind specified in Section 365(b)(2) of the Bankruptcy Code, the Debtors will, on or before the Effective Date: (a) cure, or provide adequate assurance that they will promptly cure, any such default; (b) compensate, or provide adequate assurance that they will promptly compensate, the other party to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (c) provide adequate assurance of future performance under such contract or lease.

### 7.26.6 **Assumption of Executory Contracts and Unexpired Leases.**

Upon the Effective Date, the Reorganized Debtors intend to assume those executory contracts and unexpired leases listed on Exhibit "B" to the Plan. Such executory contracts to be

assumed will include all of the Debtors' insurance policies whether obtained before or after the Petition Date and whether or not listed on Exhibit "B" to the Plan.

### 7.26.7  Rejection of Executory Contracts and Unexpired Leases.

Without admitting the validity of any other executory contracts and unexpired leases, all executory contracts and unexpired leases of the Debtors that are not: (a) assumed or rejected prior to Confirmation; (b) the subject of a pending motion to assume filed prior to Confirmation; or (c) assumed pursuant to the Plan, will be rejected by the Debtors as of the Effective Date.  Such executory contracts and unexpired leases to be rejected will include, without limitation, those listed on Exhibit "C" attached to the Plan.

### 7.26.8  Rejection Claims.

A "Rejection Claim" is a general Unsecured Claim arising from the Debtors' rejection of an unexpired lease or executory contract pursuant to the Plan or pursuant to an order of the Bankruptcy Court.  Rejection Claims are classified as Class 8 Claims.  The holder of a Rejection Claim shall file with the Bankruptcy Court, and serve on counsel for the Reorganized Debtors, a Proof of Claim relative to such Rejection Claim on or before the Rejection Claims Bar Date or be forever barred from asserting any such Claim or receiving any payment or other Distribution on account of such Claim.  The Rejection Claims Bar Date means, with the exception of any bar date which already has been established by Court order, the earlier of: (a) thirty (30) days following the date of the Effective Date; or (b) with respect to an executory contract or unexpired lease rejected before the Confirmation Date pursuant to a Final Order, thirty (30) days following the entry of such Final Order.

ARTICLE VIII.

EFFECTS OF CONFIRMATION; RESERVATION OF RIGHTS

8.1  **Preservation of Claims and Rights.**

### 8.1.1  All Retained Claims Are Preserved.

As set forth above, Retained Claims include, without limitation, (a) all claims against current or former insiders, officers, directors and employees of the Debtor; (b) all claims against Creditors of the Debtors or counterparties to executory contracts or unexpired leases; (c) all claims against all

persons whose alleged liens attached to the proceeds of any of the Sales Transactions or other sale of assets; (d) all claims for indemnification or other damages related to the clean-up of the Scotts Valley Property; (e) Avoidance Actions; and (f) Retained Claims specified below.

Confirmation of the Plan effects no settlement, compromise, waiver or release of any Retained Claim unless the Plan or Order of Confirmation specifically and unambiguously so provides. The failure of the Plan to refer to any particular Retained Claim is not and shall not be construed as a settlement, compromise, waiver, or release of any such Retained Claim. All Retained Claims are hereby preserved and shall continue to remain valid after the Effective Date.

### 8.1.2  Specific Retained Claims That Might Be Pursued.

Without limiting the generality of the scope of the previous paragraph, the Debtors believe that the Retained Claims include the following:

**Alcatel Vacuum Technology France, S.A.S. ("Alcatel")**: The Debtors are investigating potential Retained Claims against Alcatel. Previously, TTI filed a complaint against Alcatel alleging infringement of certain patents which were sold in the Purchase Transaction. TTI lost the decision at the lower court level and the court there ordered TTI to reimburse Alcatel for $162,902 Euros. This amount is included in TTI's Schedules as disputed. TTI appealed the decision, and such appeal was assumed by SPP in the Purchase Transaction. The Purchase Agreement contemplates that if SPP is successful in prosecuting this claim against Alcatel, the Debtors will either eliminate their liability, if any, to Alcatel or receive a payment pertaining to past royalties.

**Microcontrol Electronic Srl ("Microcontrol")**: Microcontrol has outstanding payables due to the Debtors in an amount of approximately $194,000. The Debtors are continuing discussions with Microcontrol to resolve this matter. In the event that the parties are unable to reach a resolution, the Debtors reserve the right to prosecute this Retained Claim against Microcontrol.

**Scientech Corporation ("Scientech")**: Scientech is a company based in Taiwan which is indebted to the Debtors' subsidiaries in the United Kingdom and in Taiwan in the amount of approximately $342,000 and is in possession of the Debtors' consigned inventory (which the Debtors value at approximately $426,000). The Debtors' subsidiary in Taiwan commenced an action against Scientech in December 2009. The Debtors are continuing to investigate and consider

Case 09-54511    Doc# 416    Filed: 01/07/10    Entered: 01/07/10 17:33:01    Page 66 of 86

their rights against Scientech in connection with the prosecution of this Retained Claim. In addition, Scientech has asserted an Unsecured Claim in the amount of $1,115,702. The Debtors are continuing to investigate and evaluate Scientech's Claim and may file an objection thereto.

**AT Germany**: Also as discussed above, AT Germany filed a general unsecured Claim against the Debtors and is indebted to the Debtors for certain intercompany transfers. Accordingly, the Debtors believe that they may offset AT Germany's Claim to the extent it is Allowed. The Debtors are continuing discussions with AT Germany to resolve this matter. In the event that the parties are unable to reach a resolution, the Debtors reserve the right to prosecute this Retained Claim against AT Germany.

### 8.1.3 Investigation and Prosecution of Retained Claims.

The Debtors have been investigating potential Retained Claims, including those against the aforementioned parties. In the event that any Claims are asserted against the Debtors that current or former insiders of the Debtors may be partially or fully responsible for, the Debtors and Reorganized Debtors reserve all rights to seek recovery against such current or former insiders; provided, however, that prosecution of any such claims will be handled by the Creditors' Committee. Should the Responsible Person decide not to prosecute a particular Retained Claim, the Creditors' Committee may prosecute and liquidate such matter on behalf of the Reorganized Debtors. The entry of the Order of Confirmation shall not constitute res judicata or otherwise bar, estop or inhibit any actions by the Reorganized Debtors relative to any Retained Claims.

### 8.2 Waiver of Terms of the Plan.

After the Confirmation Date, except as otherwise specifically set forth in the Plan, any term of the Plan may be waived only by the party or parties entitled to the benefit of the term to be waived.

### 8.3 Modification of the Plan.

The Debtors may propose amendments to or modifications of the Plan under Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the conclusion of the hearing on Confirmation of the Plan. After the Confirmation Date, the Reorganized Debtors may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019.

### 8.4 **Retention of Jurisdiction.**

Article X of the Plan provides that the Bankruptcy Court shall have exclusive jurisdiction of the Bankruptcy Cases: (a) to enforce the provisions, purposes, and intent of the Plan, including matters or proceedings that relate to the Purchase Transaction; (b) to determine the allowance or disallowance of Claims and Interests; (c) to hear and determine proceedings initiated before or after the Confirmation Date and the Effective Date regarding the prosecution of the Retained Claims or any other rights, Claims, causes of action or claims for relief held by the Reorganized Debtors against any party, including the recovery of property and subordination of Claims and Interests; (d) to fix and approve allowance of compensation and other Administrative Claims, including, if appropriate, payments to be made in connection with the Plan; (e) to adjudicate controversies arising from the terms of the Plan; (f) to hear and determine any proposed modifications of or amendments to the Plan to the extent permitted by Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; (g) to enforce or interpret the provisions of the Plan, the Order of Confirmation or any order entered by the Bankruptcy Court in the Bankruptcy Case; (h) to facilitate the consummation of the Plan; (i) to consider such other matters as may be set forth in the Plan or the Order of Confirmation; (j) to hear and determine any Claim of any Persons of any nature whatsoever against the Committee's Professionals and/or the Debtors' Professionals arising in or related to the Case; and (k) to enter a Final Decree closing the Bankruptcy Cases. If closed, the Bankruptcy Cases may be reopened at any time to facilitate the provisions of Article X of the Plan.

### 8.5 **Effect of Order of Confirmation.**

As of the Confirmation Date, the effect of the Order of Confirmation shall be as provided in Section 1141 of the Bankruptcy Code, and as follows:

#### 8.5.1 **Binding Effect of Plan.**

The provisions of the confirmed Plan will bind the Debtors, the Reorganized Debtors, any entity acquiring property under or otherwise accepting the benefits of the Plan, and every Creditor and Equity Security Holder, whether or not such Creditor or Equity Security Holder has filed a Proof of Claim or Interest in the Bankruptcy Case, whether or not the Claim or Interest of such Creditor or Equity Security Holder is impaired under the Plan, and whether or not such Creditor or Equity

Security Holder has accepted or rejected the Plan.

### 8.5.2   Revesting.

On the Effective Date, all property of the Debtors and the Bankruptcy Estates will vest in the Reorganized Debtors, free and clear of any and all liens, encumbrances, Claims and Interests of Creditors and Equity Security Holders except as otherwise provided in the Plan. Revesting does not modify the nature of any contracts assumed by the Debtors and/or Reorganized Debtors.

### 8.5.3   Full Satisfaction of Claims and Interests.

Except as otherwise provided in the Plan and the Order of Confirmation, the rights afforded in the Plan will constitute full and complete satisfaction and release of all Claims and Interests, including any interest accrued thereon from and after the Petition Date, against the Debtors, the Reorganized Debtors, the Bankruptcy Estates, or any assets or property of the Debtors, the Reorganized Debtors and the Bankruptcy Estates.

## ARTICLE IX.

## RISK FACTORS

Holders of Impaired Claims and Impaired Interests entitled to vote on the Plan should read and consider carefully the factors set forth below, as well as other information set forth in this Disclosure Statement and the documents delivered together herewith and/or incorporated by reference herein prior to voting to accept or reject the Plan.

### 9.1   Claims in Excess of Estimates

The Administrative Claims Bar Date and Rejection Claims Bar Date will occur after Confirmation and the Allowed amount of such Claims may increase the total liabilities of the Reorganized Debtors and therefore decrease the percentage Distribution to holders of Claims and Interests. Additionally, if the Reorganized Debtors are unsuccessful in their objections to Disputed Claims and contingent Claims that are asserted against the Debtors, the total liabilities will be greater than estimated, thereby potentially reducing any ultimate Distribution to holders of Claims and Interests.

### 9.2   Estimation of Claims and Distribution Risks

In composing the Plan, the Debtors have endeavored to consider what they believe are

65   DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF
Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 17:39:31   Page 69 of
86

reasonable possibilities for Distributions, if any, to be made to parties holding Allowed Claims. However, there can be no certainty that the Debtors' considerations will be accurate and that Creditors will receive Distributions described in the Plan. The Debtors' considerations will necessarily be affected by, among other things: (1) proceeds collected from the promissory notes received from the Purchase Transaction; (2) recoveries by the Reorganized Debtors in connection with the liquidation of all other assets; (3) recoveries by the Reorganized Debtors on the Retained Claims; (4) the outcome of objections to Claims; and (5) the cost and expenses of such actions.

9.3    **Bankruptcy Risks**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only is such claim or interest is substantially similar to the other claims or interest of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all of the requirements for confirmation of a plan under section 1129.

9.4    **Subsidiary Closures**

The winding down and closing of the Debtors' direct and indirect subsidiaries may take longer and result in less recoveries, or no recovery, to the Debtors as a result of foreign jurisdiction requirements, or other factors or events impacting the business closures.

9.5    **Value of Inventory**

The Debtors' assets include various product lines, equipment and inventory whose value may decline based on the uncertainty of the market environment. This may affect the Debtors' ability to liquidate any such assets and/or SPP's ability to sell any outstanding inventory as contemplated

pursuant to the Purchase Agreement.

9.6 **Collection Risks**

The Debtors and/or SPP may experience increasing difficulty collecting remaining outstanding accounts receivable. As a result certain factors, including, *inter alia*, economic conditions and the impact of the Debtors' Bankruptcy Cases, obligors under the Debtors' accounts receivable may be unable or unwilling to pay the Debtors for products and services that they have provided and upon which the outstanding accounts receivable have been generated.

9.7 **Purchase Transaction Risks**

The promissory notes included in the Purchase Transaction have an 18-month maturity term. Recoveries are dependent on and subject to the extent of the collection of certain accounts receivable and sales of inventory. Therefore, the value realized from the promissory notes is uncertain at this time and could ultimately be less than estimated by the Debtors at this time.[14]

9.8 **Environmental Compliance and Remediation.**

As discussed above, the Scotts Valley Property is a Superfund site that has been in remediation for years. The Debtors believe the Scotts Valley Property will receive required clearances and the removal of its designation as a Superfund site; however, if this does not occur, it may affect the Debtors' ability to sell the property and increase expenses to address related, ongoing issues.

ARTICLE X.

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

10.1 **Introduction.**

**THE FOLLOWING IS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN THAT MAY BE MATERIAL TO CREDITORS (EACH A "HOLDER" AS REFERRED TO IN THIS ARTICLE). THIS DISCUSSION IS INCLUDED FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT INTENDED TO BE, AND IS NOT, LEGAL OR TAX ADVICE TO ANY**

---

[14] As set forth above, one of the promissory notes, the recourse note, is guaranteed. Accordingly, the Debtors believe that collection on that note is probable.

PARTICULAR HOLDER. THIS SUMMARY IS BASED ON THE CURRENT PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE" AS REFERRED TO IN THIS ARTICLE), THE INCOME TAX REGULATIONS (THE "REGULATIONS") AND OTHER LEGAL AUTHORITIES, ALL OF WHICH ARE SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. NO RULINGS FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR OPINIONS OF COUNSEL HAVE BEEN OR WILL BE REQUESTED CONCERNING THE MATTERS DISCUSSED BELOW. THE TAX CONSEQUENCES SET FORTH IN THE FOLLOWING DISCUSSION ARE NOT BINDING ON THE IRS OR THE COURTS, AND NO ASSURANCE CAN BE GIVEN THAT CONTRARY POSITIONS WILL NOT BE SUCCESSFULLY ASSERTED BY THE IRS OR ADOPTED BY A COURT.

THIS SUMMARY DOES NOT ADDRESS STATE OR FEDERAL INCOME TAX CONSEQUENCES TO INTEREST HOLDERS.

THE FOLLOWING DISCUSSION DOES NOT APPLY TO CERTAIN HOLDERS WHO, DUE TO THEIR PARTICULAR CIRCUMSTANCES, MAY BE SUBJECT TO SPECIAL RULES. THOSE HOLDERS INCLUDE HOLDERS WHO ARE DEALERS IN SECURITIES, FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, OR FOREIGN PERSONS.

        10.2    **IRS Circular 230.**

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED

**ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**EACH HOLDER SHOULD CONSULT THE HOLDER'S OWN TAX ADVISOR TO DETERMINE THE HOLDER'S PARTICULAR U.S. FEDERAL INCOME TAX CONSEQUENCES AND OTHER TAX CONSEQUENCES TO THE HOLDER OF THE PLAN, INCLUDING ANY STATE, LOCAL AND FOREIGN TAX LAWS AND THE EFFECT OF ANY CHANGES IN SUCH LAWS.**

10.3    **Consequences to Debtors.**

In general, the Code provides that a debtor in a bankruptcy case is not taxable on cancellation of debt ("COD") income, but must release certain of its tax attributes (such as its net operating loss ("NOL") carryforwards and its tax basis in its assets) by the amount of COD income. COD income results when the amount of debt discharged exceeds the consideration given in exchange therefore, and is equal to such excess amount. Notwithstanding the absence of a bankruptcy discharge, it is likely that a cancellation of debt will be deemed to have occurred on the Effective Date. Any reduction in tax attributes does not occur, however until the end of the taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD is incurred.

10.4    **Consequences to Creditors.**

Generally, any amount received by a Creditor in satisfaction of an Allowed Claim, to the extent such amount constitutes "gross income" within the meaning of Section 61 of the Code, will be taxable to the Creditor in accordance with the Creditor's method of accounting, if not previously included in the Creditor's gross income. This would include, for example, payments of interest, rent or compensation for services. If a Creditor previously reported as taxable income, their respective Allowed Claim then the unpaid portion of the previously reported taxable income would be deductible as a business bad debt. A Creditor may be subject to regular income tax withholding or backup withholding, as described below, with respect to such payments. Creditors should consult with their own tax advisors as to the character and timing of recognition of any gain, loss or deduction they are planning to include in their tax return.

Any amount received by a Creditor in satisfaction of accrued interest on a Claim will be taxable to the Creditor as interest income, if not previously included in the Creditor's gross income. A Creditor may be subject to backup withholding, as described below, with respect to such interest payments.

Each Creditor who receives cash in partial or complete satisfaction of the Creditor's Claim will recognize gain or loss equal to the difference between the amount of cash received and the Creditor's tax basis in the Creditor's Claim. Gain may be recognized, for example, by a Creditor who acquired a Claim at a discount or who previously reported a bad debt deduction or worthless security loss with respect to all or a portion of the Claim.  GENERALLY, ANY GAIN RECOGNIZED WILL BE CONSIDERED CAPITAL GAIN if the Claim is held as a capital asset, and GENERALLY will be ordinary income if the Claim is not held as a capital asset. Capital gain will generally be long-term capital gain if the Claim has been held for more than 12 months. <u>Creditors should consult with their own tax advisors as to the character and timing of recognition of ANY gain, loss or deduction THEY ARE PLANNING TO INCLUDE IN THEIR TAX RETURN</u>.

Any loss will GENERALLY be a capital loss if the Claim is a capital asset and if the payment is deemed a "retirement" of the Claim within the meaning of Section 1271 of the Code. A Creditor who receives no payment with respect to a Claim (and a Creditor who receives a payment which is not a "retirement" and incurs a loss) should generally be able to claim a bad debt deduction to the extent of the Creditor's tax basis in the Claim (or, in the case of a Creditor receiving a payment, the excess of the tax basis in the Claim over the payment received). A Creditor who holds a Claim as a non-business bad debt and who is not a corporate Creditor will generally only be able to claim a short-term capital loss with respect to such Claim. A Creditor who holds a Claim which is a "security" as defined in Section 165(g) of the Code will generally only be able to claim a capital loss rather than a bad debt deduction. Limitations apply to the ability to deduct capital losses. <u>Creditors should consult with their own tax advisors as to the character and timing of recognition of ANY gain, loss or deduction THEY ARE PLANNING TO INCLUDE IN THEIR TAX RETURN</u>.

Because a loss is allowed only for the tax year in which it is sustained, a Creditor that claims a loss or deduction in the wrong tax year risks losing the benefit of such loss or deduction in its

entirely. Creditors should consult with their own tax advisors as to the character and timing of recognition of ANY gain, loss or deduction THEY ARE PLANNING TO INCLUDE IN THEIR TAX RETURN.

### 10.5    **Consequences to Holders of Equity Securities.**

Amounts received by stockholders in complete liquidation of ATI should be treated as payments made in exchange for their common stock.  In general, each ATI stockholder should recognize gain or loss equal to the difference between the amount of consideration received by such ATI stockholder and the ATI stockholder's adjusted tax basis in the shares of ATI stock surrendered.

Gain or loss should be determined separately for each block of shares, with a "block" consisting of shares acquired at the same cost in a single transaction.  Such gain or loss will be long-term capital gain or loss, provided the shares are held for investment and the stockholder's holding period for such shares is more than 12 months.  Long-term capital gains are generally subject to a maximum federal income tax rate of 15% for non-corporate stockholders, and short-term capital gains are subject to tax at ordinary income tax rates.  Capital losses not offset by capital gains may be deducted against a non-corporate stockholder's ordinary income only up to a maximum annual amount of $3,000.  A non-corporate stockholder may not carry back capital losses, but such losses may be carried forward to subsequent tax years.  All net capital gains for a corporate stockholder are subject to tax at regular corporate tax rates.  Although a corporate stockholder can generally deduct capital losses only to the extent of capital gains, any unused capital losses of a corporate stockholder may generally be carried back three years and forward five years.

### 10.6    **Consequences to Option Holders and Warrant Holders.**

If an option holder or warrant holder acquired such option or warrant in an investment transaction and has a tax basis in such Holder's option or warrant, such Holder should be able to claim a capital loss with respect to the cancellation of the option or warrant subject to limitations applicable to the deduction of capital losses.

### 10.7    **Wage Withholding.**

If any Allowed Claim under the Plan constitutes "wages" for U.S. federal income tax purposes, the U.S. federal income tax rules applicable to wage withholding will apply to the payment

K:\AGP\PFS\HLdr 2 DS\DisclStmt (416TH).doc

of the Allowed Claim.

10.8 **Backup Withholding.**

U.S. federal income tax laws require that, to avoid backup withholding with respect to "reportable payments" (currently at a rate of 28%). A Creditor or Holder must: (a) provide Debtors with its correct taxpayer identification number ("TIN") on IRS Form W-9 and certify as to their eligibility for exemption from backup withholding; or (b) establish a basis for exemption from backup withholding on an appropriate IRS Form W-8 (including a Form W-8BEN, W-8ECI, W-8EXP and W-8IMY) or IRS Form W-9, as applicable. Exempt Creditors and Holders (including, among others, all corporations and certain foreign individuals) are not subject to backup withholding and reporting requirements. If withholding is made and results in an overpayment of taxes, a refund may be obtained.

## ARTICLE XI.

## VOTING PROCEDURES AND REQUIREMENTS

11.1 **Creditors and Interest Holders Entitled to Vote.**

Only impaired (as that term is defined in Section 1124 of the Bankruptcy Code) classes under the Plan are entitled to vote on the Plan.

11.2 **Definition of Impairment.**

Section 1124 of the Bankruptcy Code provides in part as follows:

. . . a class of claims or equity interests is impaired under a plan unless, with respect to each claim or equity interest of such class, the plan-

(1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of its claim or interest after the occurrence of a default:

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### 11.3    Classes Impaired Under the Plan.

Classes 1, 5, 6, 8, 9 and 11 are impaired by the Plan and entitled to vote. No other classes are impaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, a class that is not impaired under the Plan, and each holder of a Claim or Interest of such class, are conclusively presumed to have accepted the Plan, and solicitation of acceptances with respect to such class from the holders of Claims or Interests of such class is not required. Therefore, Creditors from Classes 2, 3, 4 and 7, and holders of Interests in Class 10 do not need to return a Ballot.

### 11.4    Vote Required for Class Acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of Creditors as acceptance by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims of that class which actually cast ballots for acceptance or rejection of the Plan, i.e., acceptance takes place only if two-thirds (2/3) in amount and a majority in number of the Creditors voting cast their ballots in favor of acceptance.

### 11.5    Procedures.

With the Plan and Disclosure Statement, Creditors and holders of Class 11 Interests will receive a Ballot and instructions for voting on the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot sent to you with this Disclosure Statement and the Plan.

A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection. The Bankruptcy Court may temporarily allow a Disputed

Claim to which an objection has been filed for purposes of voting on the Plan. Therefore, although holders of Disputed Claims to which an objection has been filed will receive Ballots, these votes will not be counted unless the Bankruptcy Court temporarily allows such Claims for purposes of voting on the Plan.

If a party in interest is a member of more than one class, it will receive a Ballot for each class. IF YOU ARE A MEMBER OF MORE THAN ONE CLASS, YOU MUST FILL OUT AND RETURN ALL BALLOTS SENT TO YOU FOR YOUR VOTE TO COUNT IN EACH CLASS. CREDITORS WISHING TO VOTE ON THE PLAN MUST COMPLETE THE BALLOT PROVIDED AND RETURN IT NO LATER THAN _____, 2010 TO:

> Murray & Murray
> A Professional Corporation
> Attn: John Walshe Murray
> 19400 Stevens Creek Boulevard, Suite 200
> Cupertino, California 95014-2548

IF YOUR BALLOT IS NOT RETURNED BY _____, 2010 (the "<u>VOTING DEADLINE</u>"), IT WILL NOT BE CONSIDERED. BALLOTS WHICH ARE RETURNED BUT NOT PROPERLY EXECUTED WILL NOT BE CONSIDERED. BALLOTS WHICH ARE EXECUTED BUT WHICH FAIL TO INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL BE CONSIDERED AS ACCEPTING THE PLAN.

ARTICLE XII.

<u>CONFIRMATION PROCEDURES; OBJECTIONS TO CONFIRMATION</u>

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

12.1    **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation (approval) of the Plan (the "<u>Confirmation Hearing</u>"). The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any postponement thereof. Section 1128(b) provides that any party in interest may object to confirmation of the Plan. Any objection to Confirmation must be made in writing and filed with the Bankruptcy Court and served on the following parties, together with a certificate of service, no later than _____, 2010:

John Walshe Murray
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000 and (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com

and

Robert G. Harris, Esq. and
BINDER & MALTER LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408) 295-1700
Facsimile: (408) 295-1531
Email: Rob@bindermalter.com

and

Office of the United States Trustee
United States Department of Justice
Attn.: Nanette Dumas
280 S. First Street, Suite 268
San Jose, CA 95113-0002
Telephone: (408) 535-5525
Fax: (408) 535-5532
Email: Nanette.Dumas@usdoj.gov

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

### 12.2   Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court must confirm the Plan if it determines that all of the requirements of Section 1129 of the Bankruptcy Code have been satisfied.  Applicable requirements are as follows:

(1)   The Plan complies with the applicable provisions of the Bankruptcy Code;

(2)   The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(3)   The Plan has been proposed in good faith and not by any means forbidden by law;

(4)   Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Case, has

been approved by, or is subject to the approval of, the Court as reasonable;

(5) The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(6) With respect to each class of impaired Claims or Interests, each holder of a Claim or Interest of such class either (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code;

(7) Subject to the "cramdown" provisions of the Bankruptcy Code discussed in Section 12.4 below, each class of Claims or Interest has accepted the Plan;

(8) Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that incurred, Allowed Administrative Claims will be paid in full on the Effective Date of the Plan and that Allowed Tax Claims will be paid in full over a period not longer than five (5) years from the Petition Date;

(9) If a class of Claims is impaired under the Plan, at least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class;

(10) Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan;

(11)　All fees payable under section 1930 of title 28, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan; and

(12)　All transfers of property of the Plan are to be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

### 12.3　**Compliance with Confirmation Requirements.**

The Debtors believe that all of the foregoing requirements have been or will be met prior to the Confirmation Hearing.  Specifically, they believe: (1) the Plan is in the best interests of Creditors, in that holders of all Allowed Claims will receive payments under the Plan having a present value as of the Effective Date of the Plan in amounts not less than the amounts likely to be received if the Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code; and (2) the Plan will be accepted by sufficient votes in each impaired class or may be confirmed under the cramdown standards of Section 1129(b) even if sufficient votes are not received.

### 12.4　**Cramdown.**

In the event that any impaired class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the proponents if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  A plan of reorganization "does not discriminate unfairly" against a class if the plan allocates value to that class in a manner consistent with the treatment afforded to other classes with similar legal claims against the Debtors.  "Fair and equitable" has different meanings for the holders of secured and unsecured claims, and for holders of interests.

With respect to a secured claim, "fair and equitable" means either: (a) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens; (b) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds are treated in accordance with clauses

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 17:43:01   Page 81 of
86

1   (a) or (c) hereof; or (c) the impaired secured creditor realizes the "indubitable equivalent" of its

2   claim under the plan.

3         With respect to an unsecured claim, "fair and equitable" means either: (a) each impaired

4   unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or

5   (b) the holders of claims and interests that are junior to the claims of the dissenting class will not

6   receive any property under the plan.

7         With respect to a class of interests, "fair and equitable" means either: (a) the plan provides

8   that each holder of an interest of such class receive or retain on account of such interest property of a

9   value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed

10   liquidation preference to which such holder is entitled, any fixed redemption price to which such

11   holder is entitled, or the value of such interest; or (b) the holder of any interest that is junior to the

12   interests of such Class will not receive or retain any property under the plan on account of such

13   junior interest.

14         In the event that one or more classes of impaired Claims or Interests rejects the Plan, the

15   Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable

16   and does not discriminate unfairly against any rejecting impaired class of Claims or Interests.

17                                ARTICLE XIII.

18                          BEST INTERESTS TEST

19         The Bankruptcy Court must independently determine that the Plan is in the best interest of all

20   classes of Creditors and Interests.  The "best interest" test requires that a plan provide to each

21   dissenting member of each impaired Class a recovery that has a present value at least equal to the

22   present value of the distribution which each such Creditor or Interest holder would receive if the

23   Debtors were liquidated under chapter 7 of the Bankruptcy Code.

24         In performing this analysis, the Bankruptcy Court must determine the amount that would be

25   generated from a chapter 7 liquidation of the Debtors' assets after deducting the cost of liquidation.

26   The cost of liquidation would include the Trustee's commissions, the Trustee's expenses, fees for

27   counsel and other professionals retained by the Trustee, and Administrative Claims.  In addition to

28   liquidating the Debtors' assets, the Trustee must also decide whether to litigate certain claims and

possibly other litigation matters.  Generally, no distribution is made in a chapter 7 case until all assets of the Bankruptcy Estates and all claims have been liquidated, a process that often can take many months and sometimes years.  This delay could further impair the value of any distribution made to holders of Claims under a chapter 7 liquidation.  As detailed below, in these Cases, due to the complexity of the Purchase Transaction and the Debtors' products, operations and corporate structure, the delay and expense required by a trustee in a chapter 7 liquidation is estimated to be substantial.

Furthermore, should these Cases be converted to Chapter 7, absent substantive consolidation as proposed by the Plan, arguably three separate Chapter 7 Trustees would be appointed to administer the separate Estates, resulting in substantial administrative expenses.  Were a Chapter 7 Trustee to determine that substantive consolidation is appropriate, there are certain procedures that the Chapter 7 Trustee would have to follow in order to obtain the same results achieved by the Plan. At a minimum, a Chapter 7 Trustee would have to file and serve a motion upon all interested parties. Should that motion be contested, if, for example, one of the appointed trustees disagreed with the appropriateness of substantive consolidation, the Chapter 7 Estates would bear the costs of litigating the motion and negotiating with parties before consolidation could be affected.

On the other hand, barring unforeseen Claims, Confirmation of the Plan will enable the Reorganized Debtors to collect and distribute all liquidation proceeds which the Debtors believe will result in the highest and best recovery for Creditors and Equity Security Holders.  By proceeding to liquidate the remaining assets and distribute the Reorganized Debtors' cash proceeds in accordance with the Plan, the Debtors believe that the liquidation proceeds can be distributed sooner and at a lesser expense.  The Purchase Transaction, and the Debtors' products, operations and corporate structure are multifaceted and complex.  They require attention to matters by management familiar with the Debtors in order to maximize the Estates and the potential return to creditors.  Examples of such matters include, without limitation:

- Management of post-Sale activities, report on SPP's collection of accounts receivables, and overview and audit the usage of inventory;

- Review and settlement of all international liabilities and commitments to effect an orderly

Case 09-54511   Doc# 416   Filed: 01/07/10   Entered: 01/07/10 17:43:21   Page 83 of 86

and cost effective liquidation of each subsidiary. Direction of international professionals to minimize potential taxes on the upstreaming of cash to the Debtors;

- Settlement of VAT tax accounts to ensure a maximum refund;
- Settlement of the dilapidation costs relating to two subsidiary buildings in Nailsea, England;
- Management of cash assets on global scale to ensure proper flow and control of cash between entities during the wind down period;
- Solicitation of offers for and the sale of the Debtors' system product lines relating to their atomic layer deposition technology;
- Solicitation of offers for and the sale of Obsolete Inventory worldwide;
- Solicitation of offers for and the sale of the Scotts Valley Property; and
- Liquidation of remaining fixed assets at the Scotts Valley Property facilities.

Therefore, only through management knowledgeable with the Debtors' products and operations, the Debtors will be able to proficiently wind down its affairs and maximize the value of its assets in the most cost-effective manner.

The net proceeds of the Reorganized Debtors' assets will be distributed in accordance with the priority scheme set forth in the Bankruptcy Code. Any assets not liquidated prior to confirmation of the Plan will be liquidated by the Reorganized Debtors, acting through the Responsible Person. Therefore, the Debtors believe that the liquidation under the Plan will achieve at least the same results as would occur in the conversion of the Cases to chapter 7. The result can be achieved without the duplication and incurrence of substantial administrative costs that would result from the appointment of a chapter 7 Trustee and the employment of additional professional persons, and the delay attendant with the administration of the assets in chapter 7.

The remaining assets of the Debtors include various product lines, equipment and inventory which pertain to the highly-technical products developed by the Debtors. Consequently, as detailed above, the Debtors are in the best position to market and sell such assets for the benefit of the Estates. Similarly, while the collection of receivables, sale of inventory and wind down of the Debtors' subsidiary companies may take over 24 months, only the Debtors possess the knowledge required to conclude these matters in the most cost-efficient manner.

Case 09-54511  Doc# 446  Filed: 01/07/10  Entered: 01/07/10 17:35:21  Page 84 of 86

1    Those Creditors who are impaired under the Plan, therefore, are receiving, at a minimum, the

2    equivalent of what they would receive if the liquidation was accomplished in chapter 7 cases.  The

3    Debtors believe that the Creditors will fare much better should the liquidation be achieved in chapter

4    11 under the Plan.

5                                   ARTICLE XIV.

6                                   FEASIBILITY

7        The Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by

8    the liquidation or the need for further financial reorganization of the Debtors or the Reorganized

9    Debtors unless such liquidation or reorganization is contemplated by the Plan itself.  The Plan

10   contemplates the final liquidation and Distribution of the Debtors' assets, and the liquidation

11   proceeds will be expended to execute the liquidation and Distribution process described in the Plan.

12                                  ARTICLE XV.

13                        POST-CONFIRMATION MANAGEMENT

14       The Reorganized Debtors will be managed by the Responsible Person.  As discussed at

15   Section 7.10 above, Patrick C. O'Connor will be the Responsible Person of the Reorganized

16   Debtors.  Mr. O'Connor was the Chief Financial Officer of Aviza from September 2003 through

17   December 2005, and the Chief Financial Officer of ATI from December 2005 to October 2009.

18   Presently, in addition to being the Court-appointed Responsible Person for the Debtors, Mr.

19   O'Connor is the Chief Executive Officer and Chief Restructuring Officer and has held that position

20   since October 2009.

21                                  ARTICLE XVI.

22                              Plan Interpretation

23       The headings contained in the Plan are for convenience of reference only and do not limit or

24   otherwise affect in any way the meaning or interpretation of the Plan.  All references in the Plan to

25   the singular are to be construed to include references to the plural and vice versa.   All references in

26   the Plan to any one of the masculine, feminine or neuter genders will include references to both other

27   such genders.  **Exhibit "A"** and **Exhibit "B"** attached hereto are, by this reference, hereby

28   incorporated herein and into the Plan.  All references in the Plan to a Section or an Article means the

Case 09-54511   Doc# 446   Filed: 01/07/10   Entered: 01/07/10 17:43:01   Page 85 of
86

appropriately numbered Section or Article of the Plan.  Whenever the Plan uses the term "including," such reference means "including, but not limited to."

January 7, 2010

**ATI LIQUIDATING, INC.**
A DELAWARE CORPORATION

By: /s/ Patrick C. O'Connor
    Patrick C. O'Connor
    Chief Executive Officer

January 7, 2010

**AI LIQUIDATING, INC.**
A DELAWARE CORPORATION

By: /s/ Patrick C. O'Connor
    Patrick C. O'Connor
    Chief Executive Officer

January 7, 2010

**TTI LIQUIDATING, INC.**
A DELAWARE CORPORATION

By: /s/ Patrick C. O'Connor
    Patrick C. O'Connor
    Chief Executive Officer

**MURRAY & MURRAY**
A Professional Corporation

By: /s/ John Walshe Murray
    John Walshe Murray
    Attorneys for Debtors